Opinion of the Court.
This was an action of trespass, assault and battery, and false imprisonment, brought by Amy, a woman of colour, against William Smith. The defendant pleaded that the plaintiff was his slave, and concluded with a verification. To this plea the plaintiff made no replication; and when, at a subsequent term, the cause was called for trial, she, by her counsel, objected to the sufficiency of the plea, and moved the court to require of the defendant the plea of not guilty; but the court overruled the motion. A jury was then sworn to try the issue; and on the trial, the plaintiff proved by a witness, that in the year Cornwallis surrendered, he went to Pennsylvania, and resided in the house of John and Michael Gingery, for eighteen months; that during that time the plaintiff lived in the same family, and waited upon Mrs. Gingery, the mother of John and Michael, her husband being then dead ; that the plaintiff was from fourteen to seventeen years of age ; that he heard the Gingerys, in repeated
conversations, say she was to be free at a particular age, not exceeding thirty or thirty-five; but that he did not recollect the precise age; that the Gingerys, in 1783, moved to Maryland, taking the plaintiff with them; that old Mrs. Gingery died that year, after their removal to Maryland, and that shortly afterwards he left Maryland, and never again saw the plaintiff, until, a short time before bringing this suit, she presented herself before his door in Fayette county, Kentucky, when he immediately recognized her. The plaintiff also proved by sundry witnesses, that between 1780 and 1790, they knew her in Virginia, where the Gingerys had removed, and that for several years she acted and passed as a free person, without any one exercising any ownership over her. The plaintiff then read in evidence the will of Christian Gingery, the father of John and Michael, in which, among other devises to his wife, he directs "that she is to have the mulatto girl during her natural life, or until the girl comes to the age of thirty one years;” and he makes his sons, John and Michael, his residuary devisees of all his real and personal estate. The plaintiff also read the abolition act of Pennsylvania.
On the part of the defendant, it was proved, that the plaintiff’s mother was of unmixed African blood, and *328 a slave for life, and that the plaintiff was born m Pennsylvania, prior to the passage of the abolition act of that state, and was sold, when very small, to old Mr. Gingery, as a slave: that she was always held in slavery, except for a short time, when she ran away from the Gingerys, in Virginia; that they sold her to the defendant in 1790, in Virginia, who shortly after removed to Kentucky, and that the plaintiff, nor any one for her, ever asserted or pretended any claim to her freedom until the commencement of this suit. The defendant read and relied on the laws of Pennsylvania and Maryland, providing the mode by which slaves might be emancipated; and also the statute of Kentucky, approved February 20th, 1808, entitled “ an act limiting actions in certain cases.”
Statement the case. 0f
To the deposition of David Shipman, which was read on the part of the defendant, the plaintiff objected, for the want of notice. The defendant then exhibited a notice to take the deposition between the hours of 11 in the morning and 8 in the evening, at Mr. Chinn’s office in Lexington, and proved the service of the notice about 8 or 9 o’clock of the morning of the same day, upon Mr. Blair and Mr. Hickey, attorneys for the plaintiff, practising in, and attending the circuit court, then in session; but the court overruled the objection, and permitted the deposition to be read.
When the evidence was closed, the counsel for the defendant claimed the right of opening and concluding the argument before the jury, and the court permitted them to do so, notwithstanding it was objected to by the plaintiff’s counsel. After the argument before the jury, the court, at the instance of the defendant’s counsel, instructed the jury—1st, That if the jury found, from the evidence, that the mother of the plaintiff was a slave, and that she was not emancipated, according to the laws of Pennsylvania, Maryland or Virginia, and that she was purchased by the defendant as a slave, neither the plaintiff, nor any claiming; under her, is entitled to freedom, and the jury ought to find for the defendant. 2d, That the will of Christian Gingery did not emancipate the plaintiff. 3d, The plaintiff is barred by the statute passed by the legislature of Kentucky, from recovering in this action, so far as it depends upon a failure to comply with the *329 act of Pennsylvania, or that of Virginia, in the said statute recited, the writ not having been sued out within the period limited by the said statute.
Where a testator devises a slave specially to an individual for 30 years, (that being the period when, according to the laws of the country the slave would be free, if not registered,) it may be evidence that the testator believed the slave would be free at that period, or that he intended to emancipate her; but the devise for that period is not an emancipation ; especially, when, by the will, a residuary devisee of all estate not specifically devised, was constituted.
*329 And, at the instance of the plaintiff’s counsel, the court gave several instructions to the jury, which, as they are hot material in this case, need not be stated. The plaintiff’s counsel then asked the court to instruct the jury, “that if they believed, from the evidence, that the plaintiff was in the actual possession of liberty in the state of Virginia or Pennsylvania, the statute of Kentucky, of 1807, limiting the right of action of negroes, for non registering, to two years, does not bar the plaintiff’s right of action;” but the court declined giving the instruction. The plaintiff’s counsel then asked the court to instruct the jury, that although it did not emancipate, they might read the will, as evidence conducing, when combined with other circumstances in the cause, to show the plaintiff’s right to freedom ; but the court permitted the will to go to the jury, stating, however, that it did not emancipate the plaintiff.
The counsel for the plaintiff then asked the court for an exposition to the jury, of the second instruction asked for and obtained by the defendant; particularly, whether the court intended to exclude the will from the jury or not; but the court refused to give any explanation, and repeated the instructions as given before. To all these decisions of the court the plaintiff excepted, and a verdict and judgment having been rendered against her, she has appealed to this court.
1. The main points in the cause arise out of the instructions given by the court to the jury, at the instance of the defendant, and out of the refusal of the court to instruct the jury as asked by the plaintiff. These points we shall first consider, leaving those of a subordinate character to be disposed of afterwards.
The first instruction given at the instance of the defendant, when understood as we apprehend it ought to be, presents no difficulty. It simply implies, that if the plaintiff was born a slave, and had not been emancipated according to the laws of either of those states in which she had resided, she was still a slave, This is a proposition too plain to admit of being made more so, by any commentary.
2 Dig. 764.
The act of 1808, limiting actions by persons held in slavery, is no violation of that clause of the federal constitution, which prohibits a state from passing laws impairing the obligation of contracts.
Nor does the second instruction asked for the defendant, present a question of any greater difficulty, or one entitled to more consideration. The clause in the will of Christian Gingery, before recited, whereby he devises the plaintiff to his wife during her natural life, or until the plaintiff should arrive at the age of thirty-one, is the only clause of the will which can, or is pretended to have any bearing upon the point; and that clause, though it may afford ground to conjecture that the testator either intended to emancipate the plaintiff, after the death of his wife, or at the age of thirty one, by some other instrument; or that he understood that she was at that period, entitled to her freedom in some other way, cannot, most assuredly, be construed, of itself, to operate as an emancipation. Thus to construe the will, would be to give it an effect, which it does not purport to be its object to accomplish, and would be wholly unjustified by any known rule of exposition.
2. The third instruction given at the instance of the defendant, presents a question of more importance, and to which the arguments of the counsel on each side were principally directed. The act of this state, of 1808, after reciting, “Whereas creditors, purchasers and others are exposed to great injustice, by the assertion, by persons held in slavery, of dormant claims to their freedom, founded upon certain acts of the legislatures of Virginia and Pennsylvania ; and the interest and peace of society requiring that all such claims should be brought to a speedy determination,” enacts, “that no writ, suit or action shall be sued out, commenced or prosecuted by any person of colour, claiming his or her freedom in consequence of a failure to comply with the abolition act of Pennsylvania, requiring a registry of such person, or his or her ancestress ; or in consequence of having been taken into Pennsylvania, contrary to the provisions of any act of the legislature thereof; or in consequence of a failure to take or record the oath prescribed by the act of the legislature of Virginia, entitled an act for preventing the further importation of slaves, or any act amendatory thereof, unless such writ, suit or action shall be sued out, commenced or prosecuted within two years from, the passage of this act; and it shall and may he lawful for any defendant or defendants to give the same in evidence, without specially pleading it.”
1 Dig.
Nor does it violate that part of the federal constitution, which secures to the citizens of each state, all the privileges and inmunities of citizens in the several states.
It is obvious, that this act, according to the plain and literal import of its language, embraces the plaintiff’s case, so far as her right to maintain the action depends upon a failure to have her registered according to the requisitions of the act of Pennsylvania, or to have taken the oath and have it recorded, as required by the act of Virginia, on the importation of a slave into that state; nor was it contended, that the act, if it can have any operation, would not be a bar to the plaintiff’s action, so far as her right depended upon such failure. But it is urged, that the act, in limiting the right to maintain the action to two years, is void, because it is repugnant, both to the constitution of the United States and to that of this state.
It cannot be pretended, that the constitution of the United States contains any provision which prohibits the states from passing acts of limitation, in general. It may indeed be questionable, whether an act limiting the time of bringing an action to enforce a contract, which, when made, was not subject to such limitation, would not be incompatible with that clause of the constitution which prohibits a state from passing any law impairing the obligation of a contract; for if, as is supposed by some, whose opinion is entitled to great weight, the obligation of a contract consists in the remedy which the law affords to enforce its performance, it would seem to follow, that an act limiting the time of bringing an action upon a contract, which, when made, was not subject to such limitation, would impair the obligation of the contract. But in this case the action is not founded upon contract, but upon tort; and, of course, the act of 1808 cannot, upon any construction of that clause of the constitution of the United States, he said to be incompatible with it.
3. It was not, however of that clause of the constitution of the United States, that the act of 1808 was contended by the plaintiff’s counsel to bean infraction; but of the clause which provides that “the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states.”—1st clause, 2d section, and 4th article.* To entitle the plaintiff to the benefit of this clause, it is obviously necessary, that she should be a citizen of some one of the United States; and it is accordingly urged by her counsel, in support of her title to that character, that *332 she was, before her removal from Pennsylvania, a citizen of that state, and that by her removal to Virginia, she became a citizen of the latter.
Before we can determine whether she was a citizen, or not, of either of those states, it is necessary to as. certain what it is that constitutes a citizen. In England, birth in the country was alone sufficient to make any one a subject. Even a villain or a slave, born within the king’s allegiance, is, according to the principles of the common law, a subject; but it never can be admitted that he is a citizen. One may, no doubt, be a citizen by birth, as well as a subject ; but subject and citizen are evidently words of different import, and it indisputably requires something more to make a citizen, than it does to make a subject. It is, in fact, not the place of a man’s birth, but the rights and privileges he may be entitled to enjoy, which make him a citizen. The term, citizen, is derived from the Latin word, civis, and in its primary sense signifies one who is vested with the freedom and privileges of a city. At an early period after the subversion of the Roman empire, when civilization had again begun to progress, the cities in every part of Europe, either by usurpation or concession from their sovereigns, obtained extraordinary privileges, in addition to those which were common to the other subjects of their respective countries ; and one who was invested with these extraordinary privileges, whether he was an inhabitant of the city or not, or whether he was born in it or not, was deemed a citizen.—See Rees’ Cyclopædia, under the word Citizen. In England, a citizen is not only en. titled to ail the local privileges of the city to which he belongs but be has also the right of electing and being elected to parliament, which is itself rather an extraordinary privilege, since it does not belong to every class of subjects.—Com. Dig. Parliament, D. 6, 4 Inst. 6.
If we go back to Rome, whence the term, citizen, has its origin, we shall find, in the illustrious period of her republic, that citizens were the highest class of subjects to whom the jus civitatis belonged, and that the jus civitatis conferred upon those who were in possession of it, all rights and privileges, civil, political and religious.—Butler’s Horæ Juridicæ, 26, 27.
*333 When the term came to be applied to the inhabitants of a state, it necessarily carried with it the same signification, with reference to the privileges of the state, which had been implied by it with reference to the privileges of a city, when it was applied to the inhabitants of the city; and it is in this sense, that the term, citizen, is believed to be generally, if not universally understood in the United States. This, indeed, evidently appears to be the sense in which the term is used in the clause of the constitution which is under consideration ; for the terms, “privileges and immunities,” which are expressive of the object intended to be secured to the citizens of each state, in every other, plainly import, according to the best usages of our language, something more than those ordinary rights of personal security and property, which, by the courtesy of all civilized nations, are extended to the citizens or subjects of other countries, while they reside among them.
No one can, therefore, in the correct sense of the term, be a citizen of a state, who is not entitled, upon the terms prescribed by the institutions of the state, to all the rights and privileges conferred by those institutions upon the highest class of society. It is true, that females and infants do not personally possess those rights and privileges, in any state in the Union; but they are generally dependent upon adult males, through whom they enjoy the benefits of those rights and privileges; and it is a rule of common law, as well as of common sense, that females and infants should, in this respect, partake of the quality of those adult males who belong to the same class and condition in society, and of course they will or will not be citizens, as the adult males of the same class are or are not so. Nor do we mean to say, that it is necessary, even for an adult male to be a citizen, that he should be in the actual enjoyment of all those rights and privileges which belong to a citizen. He may not only not be in the actual enjoyment of those rights and privileges, but he may even not possess those qualifications, of property, of age, or of residence, which most of the states prescribe as requisites to the enjoyment of some of their highest privileges and immunities, and yet be a citizen ; but, to be a citizen, it is necessary, that he should be entitled to the enjoyment of those privileges *334 and immunities, upon the same terms upon which they are conferred upon other citizens; and unless he is so entitled, he cannot, in the proper sense of the term, be a citizen.
Prior to the adoption of the constitution of the United States, each state had a right to make citizens of any persons they pleased; but as the federal constitution does not authorise any but white persons to become citizens of the United States, it furnishes a presumption that none other were then citizens of any state; which presumption will stand, until repelled by positive testimony.
It results, then, that the plaintiff cannot have been a citizen, either of Pennsylvania or of Virginia, unless she belonged to a class of society, upon which, by the institutions of the states, was conferred a right to enjoy all the privileges and immunities appertaining to the state. That this was the case, there is no evidence in the record to show, and the presumption is against it. Free negroes and mulattoes are, almost everywhere, considered and treated as a degraded race of people; insomuch so, that, under the constitution and laws of the United States, they cannot become citizens of the United States.
4. It is true, that when the plaintiff resided in Pennsylvania and removed to Virginia, the constitution of the United States had not been adopted ; and prior to its adoption, the several states might make any person they chose, citizens. But as the laws of the United States do not now authorise any but a white person to become a citizen, it marks the national sentiment upon the subject, and creates a presumption that no state had made persons of colour citizens. And this presumption must stand, unless positive evidence to the contrary were produced. But none such was produced, either as to Pennsylvania or Virginia. On the contrary, it appears from the preamble of the abolition act of Pennsylvania, that the legislature of that state intended to confer upon those whom it was their object to emancipate, only a portion of the freedom which they themselves enjoyed ; and they could not, therefore, have designed to give them all the rights and privileges of citizens. Much less could they have designed to bestow those rights and privileges upon those who, like the plaintiff, were not intended to be emancipated ; but who might become free, by the failure of their owners to have them registered. And as it respects Virginia, we know that free people of colour have never been considered or treated, either in practice of the country or by the laws of the state, as possessing the rights and privileges of citizens. On the contrary, they are incapable of holding the lowest office in the government; they do not enjoy the right *335 of suffrage, and cannot even be a witness in a civil case. In short, they possess not one of the privileges which are peculiarly characteristic of a citizen, and not even all those which are by courtesy allowed to aliens and strangers, while residing in the state.
The said act of limitations does not violate constitution of Kentucky.
1 Dig. 41.
The plaintiff, then, not being a citizen, either of Pennsylvania or Virginia, cannot be entitled to the benefit of the clause of the constitution in question, and the act of 1808, most clearly, cannot be an infraction of it. But, supposing her to have been a citizen of Pennsylvania when she resided there, and by her removal to Virginia, to have become a citizen of that state; she must, upon the same principle have become a citizen of this state, by her removal here; and as a citizen of this state, the clause of the constitution under consideration, would evidently not apply to the case. But again, admitting her still to have remained a citizen of either of those states; yet, as the act of 1808 operates as well upon citizens of this state, as upon those of any other, it cannot be a violation of the clause of the constitution in question; for it cannot, upon any principle, be construed to secure to the citizens of other states, greater privileges, within this state, than are allowed by her institutions to her own citizens.
We cannot, therefore, in any light in which we have been able to view the subject, consider the act of 1808 as an infraction of the constitution of the United States.
5. Nor can we think it a violation of the constitution of this state. It was contended, in argument, to be in contravention of the 13th section of the 10th article, which declares, “that all courts shall be open, and every person, for an injury done him, in his land, goods, person or reputation, shall have remedy by the due course of law, and right and justice administered, without sale, denial or delay.”
We cannot admit that this section should be construed to operate as a restriction upon the power of the legislature to pass acts of limitation. It would rather seem to require them to make laws for the expeditious administration of justice, than to permit litigation to be endless. In fact, the power of the legislature to pass such acts of limitation, has been already settled, and cannot now be considered as open for discussion in this court. The act of 1809, by which actions to re *336 cover the possession of land from actual settlers are limited to seven years, and the act of 1813, whereby the saving in the general statute of limitations, in favor of persons out of the country, &c. is repealed, are, in principle, the same as the act of 1808; and they have been decided to be constitutional and valid, by the repeated adjudications of this court. It is true, as was suggested in argument by the counsel for the plaintiff, that every day’s detention of a free person as a slave, is a new wrong; but it is equally true, that every day’s detention of the possession of land from the rightful owner, is a new wrong; and it only proves that in both instances the limitation operates upon future, and not upon past injuries, and thus affords an argument rather in vindication of the justice, as well as constitutionality of the act, than to prove it to be unconstitutional.
Upon the whole, we can perceive no error in the instructions given by the court at the instance of the defendant.
With respect to the refusal of the court to instruct the jury as asked by the plaintiff’s counsel, little need be said. It is very apparent, that the court did not err in declining to give the first of those instructions ; for the possession of liberty by the plaintiff, without right, most obviously could have no effect upon the case; and if she had right, founded upon the failure to comply with the acts of Pennsylvania or Virginia, the act of this state, of 1808, literally applied to the case.
It is equally apparent, that the court did not err in refusing the second instruction asked for on the part of the plaintiff. It was, no doubt, the duty of the court to decide upon the admissibility of the will; but having admitted the will to go to the jury, the function of the court was performed, and it belonged exclusively to the jury, to draw the inferences of fact from it.
Nor do we perceive any error in the refusal of the court to give the exposition asked, of the second instruction given at the instance, of the defendant. Indeed, after the will had, in explicit terms, been admitted by the court to go to the jury, it was not only idle but indecorous, to ask the court whether it intended to exclude the will from the jury or not.
6. With regard to the minor points made in the cause, we deem it wholly unnecessary to enter into an *337 investigation. We have, in fact, been induced to discuss the main points, rather from the nature of the case, than from any necessity there was of doing so, to enable us to arrive at the conclusion which must be the ultimate result. The defendant’s plea is unquestionably a good bar to the action ; and that is neither traversed nor avoided by the plaintiff. She has, therefore, according to the state of the pleadings, evinced no cause of action ; and, according to the repeated decisions of this court, she could not, if even error had intervened on the trial of the cause, be entitled to a reversal of the judgment.
A special plea that the plaintiff, is a slave is a good plea in bar to an action of trespass, assault and battery and false imprisonment.
The judgment must be affirmed without costs.

1 Dig. 11.