Ricky L. POSEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2004–SC–0060–DG.

Supreme Court of Kentucky.

Feb. 23, 2006.

J. David Niehaus, Daniel T. Goyette, Deputy Appellate Defender, Louisville, KY, Attorney for Appellant.

Gregory D. Stumbo, Attorney General, George G. Seelig, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Attorneys for Appellee.

Opinion of the Court by Justice GRAVES.

Appellant entered conditional guilty pleas to Trafficking in Marijuana (subsequent offense), Possession of a Firearm by a Convicted Felon, Misdemeanor Possession of a Controlled Substance, and Possession of Drug Paraphernalia in Jefferson Circuit Court. For these crimes, Appellant was sentenced to four years of probation with six months work release. Pursuant to his conditional pleas, Appellant took a direct appeal to the Court of Appeals. RCr 8.09. In an unpublished opinion, the Court of Appeals affirmed his convictions in all respects. *Posey v. Commonwealth*, 2003 WL 23008779, 02–CA–2519–MR, (rendered December 24, 2003). Appellant filed a petition for discretionary review in this Court, which we granted. CR 76.20. For the reasons set forth herein, we now affirm Appellant's convictions, but for reasons not stated in the Court of Appeals' opinion.

On January 6, 2002, two Louisville police officers attempted to serve an outstanding arrest warrant on an individual named James Powell. Powell's last known address was 1565 South Ninth Street. When the officers arrived at that address and knocked on the door, Appellant, Ricky L. Posey, appeared at the door. Appellant, who was standing immediately inside the threshold of the home, opened the door and began to talk with one of the officers.

The other officer soon joined their conversation and as they were conversing with Appellant on the porch, they observed shotgun shells and individually wrapped packets of marijuana inside the home. They also smelled an odor of marijuana emanating from the home.

From these observations, the officers decided to step inside Appellant's home (through the open door) and arrest him for possession of a controlled substance. They immediately seized the marijuana and the shotgun shells in plain view and then proceeded to search the rest of the home. They found a gun lying on the floor in an adjoining room in plain view. In addition, they found a set of electronic scales and a bottle of codeine cough syrup.

Appellant was indicted for Trafficking in Marijuana (less than eight ounces) while in Possession of a Firearm (subsequent offense[1]), Possession of a Firearm by a Convicted Felon, Misdemeanor Possession of a Controlled Substance, and Possession of Drug Paraphernalia. Appellant filed a pretrial motion to suppress all of the evidence seized during the search of his home. Appellant also filed a motion to dismiss the firearm possession charge, arguing that KRS 527.040 (barring convicted felons from possessing handguns) was unconstitutional. The trial court denied both of Appellant's motions. Appellant subsequently entered conditional pleas of guilty for all charges, reserving for appeal the suppression issue and the constitutionality of KRS 527.040.

The Court of Appeals affirmed the trial court's rulings, holding that the officers' entry into the home for the purposes of

---

**1.** This charge was subsequently amended to Trafficking in Marijuana (less than eight ounces) (subsequent offense).

arresting Appellant and seizing contraband in plain view did not violate the Fourth Amendment. The Court of Appeals further ruled KRS 527.040 constitutional, relying on this Court's decision in *Eary v. Commonwealth*, 659 S.W.2d 198 (Ky.1983). We accepted discretionary review and now affirm on both issues.

## I. Fourth Amendment Issue

■ Appellant first argues the officers violated his Fourth Amendment rights when they entered his home without consent and without a warrant for the purpose of seizing evidence and arresting him for a misdemeanor crime.[2] He contends that while the police would have been justified in arresting him and seizing the marijuana had he been located in a public place, *see* KRS 431.005(1)(d) (permitting warrantless arrests for misdemeanors committed in the officer's presence), the Fourth Amendment barred such an arrest and seizure in his home without a warrant or consent. Because we believe exigent circumstances justified entry into Appellant's home for the purpose of preventing the imminent destruction of evidence, we reject Appellant's argument that his Fourth Amendment rights were violated in this instance.[3]

■ Absent exigent circumstances, it is not reasonable for a law enforcement agent or officer to enter a person's home without consent or a warrant. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Talbott v. Commonwealth*, 968 S.W.2d 76, 81 (Ky. 1998). "The Commonwealth bears the burden to demonstrate that exigent circumstances were present justifying the

warrantless entry." *Commonwealth v. McManus*, 107 S.W.3d 175, 177 (Ky.2003).

■ "Destruction of evidence is a recognized exigent circumstance creating an exception to the warrant requirement." *Id.* Where officers have probable cause to believe that a crime has occurred and that evidence from that crime is in imminent danger of being destroyed, it is reasonable for law enforcement officers to secure the place where the evidence is located in order to prevent its imminent destruction. *Id.* (citing *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984) (characterizing the preservation of evidence in danger of imminent destruction as a "now or never" situation)).

In this case, the marijuana was in plain view. As such, there is no dispute as to whether the officers had probable cause to believe that Appellant was in possession of a controlled substance. Moreover, since the contraband was in plain view, it was also reasonable for them to believe that the drugs were in imminent danger of being destroyed in the absence of immediate action to secure the evidence. *See Ker v. California*, 374 U.S. 23, 28, n. 3, 83 S.Ct. 1623, 1627, n. 3, 10 L.Ed.2d 726 (1963) (referring to the ease and speed with which drugs can be destroyed) and *Illinois v. McArthur*, 531 U.S. 326–327, 121 S.Ct. 946, 948, 148 L.Ed.2d 838 (2001) (police had good reason to fear that, unless restrained, defendant would destroy drugs before they could return with a warrant). Therefore, the circumstances in this case were exigent and as such, the officers acted reasonably when they entered the home without a warrant, restrained and arrested

---

2. The possession of marijuana in this case was a misdemeanor crime.

3. Appellant does not challenge, and therefore, we do not address, the constitutionality of the

subsequent search of his home once the officers made lawful entry into the home and arrested Appellant.

Appellant, and then secured the evidence which was in plain view (i.e. the marijuana and the shot gun shells).

Appellant argues that while the imminent destruction of evidence can present exigent circumstances in the case of felony crimes, they should not constitute exigent circumstances in the case of misdemeanor crimes (the possession of marijuana in this case was a misdemeanor crime). Appellant cites to *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) as support for his position. In that case, the United States Supreme Court held that likely imminent destruction of evidence did not present exigent circumstances justifying warrantless entry into a home where the offense was non-jailable and civil in nature. *Id.* at 754, 104 S.Ct. 2091. The *Welsh* Court explained that the government's interest in arresting or securing evidence for a purely "minor offense" does not outweigh the presumption of unreasonableness for warrantless entries into a person's home. *Id.* at 752, 104 S.Ct. 2091.

However, misdemeanors in Kentucky are more than mere civil offenses; they are crimes which can subject offenders to imprisonment. In this case, simple possession of marijuana is a Class A misdemeanor, KRS 218A.1422, and those found guilty of committing that crime are subject to as much as twelve (12) months imprisonment, KRS 532.090. The fact that conviction of misdemeanor crimes may result in the loss of one's freedom for as much as one year belies the contention that such crimes are "minor." As this case is clearly distinguishable from the facts in *Welsh, supra,* we find no merit in Appellant's contention that the imminent destruction of misdemeanor crime evidence is not sufficient to constitute exigent circumstances under the Fourth Amendment. *See Illinois v. McArthur,* 531 U.S. 326, 336, 121

S.Ct. 946, 952, 148 L.Ed.2d 838 (2001) (distinguishing between "jailable" and "nonjailable" offenses when determining importance of law enforcement's need to preserve evidence of those crimes); *Ingram v. City of Columbus,* 185 F.3d 579, 587 (6th Cir.1999) ("Under *Welsh,* courts must look to the state's penalty scheme to determine the seriousness of a state law offense; if the suspect has committed an offense 'for which no imprisonment is possible,' the offense is 'minor.' "); *United States v. Grissett,* 925 F.2d 776, 778 (4th Cir.1991) (exigent circumstances existed to justify warrantless entry into motel room where police smelled burning marijuana while standing outside); *Randolph v. State,* 152 S.W.3d 764, 771–72 (Tex.App. 2004) ("[I]f an offense, either a misdemeanor or a felony, is punishable by confinement and there are exigent circumstances, then it is serious enough to justify the warrantless entry of a constitutionally protected area."); *Cherry v. Commonwealth,* 44 Va.App. 347, 605 S.E.2d 297, 305 (2004) (police officer's warrantless entry into residence based on exigent circumstances after smelling burning marijuana was reasonable, even though marijuana possession was only a misdemeanor offense); *see also,* KRS 431.005(1)(d) (authorizing peace officers to make warrantless arrests of persons committing misdemeanors in their presence); *Atwater v. City of Lago Vista,* 532 U.S. 318, 340, 121 S.Ct. 1536, 1550, 149 L.Ed.2d 549 (2001) (noting that bulk of state and federal law permits warrantless arrests of persons committing misdemeanors in their presence). *But see, United States v. Carter,* 360 F.3d 1235, 1241 (10th Cir.2004) (small quantity of marijuana does not rise to the level of "serious crime" to justify warrantless entry into home on the basis of exigent circumstances); *State v. Davis,* 133 Ohio App.3d 114, 726 N.E.2d 1092, 1095 (1999) (exigent circumstances exception to the

warrant requirement did not apply to misdemeanor crime involving no violence or weapons), *reasoning overruled to some extent by City of Middletown v. Flinchum,* 95 Ohio St.3d 43, 765 N.E.2d 330, 332 (2002).

Because the contraband in this case was in plain view and possession of such contraband is a crime subject to as much as twelve (12) months imprisonment, we find the officers' warrantless entry into Appellant's home to secure the contraband was justified by exigent circumstances, namely, to prevent the imminent destruction of evidence.

## II. Constitutionality of KRS 527.040

■ Appellant next argues that KRS 527.040 is unconstitutional. Under KRS 527.040, it is a felony for convicted felons to possess, manufacture, or transport a firearm in the Commonwealth of Kentucky. Appellant contends that this law violates Section 1(7) of the Kentucky Constitution which states:

> All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: ... The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons.

■ When considering the constitutionality of a statute, this Court draws all fair and reasonable inferences in favor of the statute's validity. *Kentucky Industrial Utility Customers, Inc. v. Kentucky Utilities Company,* 983 S.W.2d 493, 499 (Ky.1998). "[T]he violation of the Constitution must be clear, complete and unmistakable in order to find the law unconstitutional." *Id.; see also Walters v. Bindner,* 435 S.W.2d 464, 467 (Ky.1968) ("It is the rule that all presumptions and intendments are in favor of the constitutionality of statutes and, even in cases of reasonable doubt of their constitutionality, they should be upheld and the doubt resolved in favor of the voice of the people as expressed through their legislative department of government.")

■ Appellant concedes that KRS 527.040 would be a legitimate exercise of the General Assembly's broad police powers[4] if Section 1(7) were not enacted as a provision of the Kentucky Constitution. *See Walters, supra,* at *Id.* ("Our Legislature has a broad discretion to determine for itself what is harmful to health and morals or what is inimical to public welfare...."). Indeed, the legislature's power to pass laws, especially laws in the interest of public safety and welfare, is an essential attribute of government. *Manning v. Sims,* 308 Ky. 587, 213 S.W.2d 577, 592 (Ky.1948) ("when the power of the Legislature to enact a law is called in question, the court should proceed with the greatest possible caution and should never declare an act invalid until after every doubt has been resolved in its favor") (quotation and citation omitted). Thus, we must always accord great deference to the legislature's exercise of these so-called "police powers," unless to do so would "clearly offend[ ] the limitations and prohibitions of the constitution." *Id., see also, Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("States traditionally have had great latitude under their police powers to legislate

---

4. The General Assembly's broad power to enact laws for the purpose of protecting the public welfare is derived from Section 29 of the Kentucky Constitution. This Section vests all legislative power with that body. *See, e.g.,* *Mullins v. Commonwealth,* 956 S.W.2d 222, 223 (Ky.App.1997) ("[T]he legislature has the power to designate what is a crime and the sentences for violations thereof.").

as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756, 105 S.Ct. 2380, 2398, 85 L.Ed.2d 728 (1985)).

However, Appellant contends that the mandates of Section 1(7) are clear and that its existence affirmatively operates to exempt the area of firearms possession from regulation by the General Assembly. Pursuant to Section 26 of our constitution, Appellant argues that KRS 527.040 is essentially nullified by Section 1(7) and should be declared invalid as an impermissible infringement upon the people's right to bear arms. For the reasons set forth herein, we disagree.

■ We begin by emphasizing that rights preserved to the people pursuant to Sections 1 through 26 of our constitution cannot be usurped by legislative fiat.[5] Ky. Const. § 26, *see also Steelvest, Inc. v. Scansteel Service Center, Inc.*, 908 S.W.2d 104, 106 (Ky.1995); *Union Trust, Inc. v. Brown*, 757 S.W.2d 218, 219 (Ky.App.1988). The Kentucky Bill of Rights has always been, and continues to be, recognized as the supreme law of this Commonwealth. *Gatewood v. Matthews*, 403 S.W.2d 716, 718 (Ky.1966). Accordingly, we consider carefully and fully any possible infringements upon these rights by a governmental power.

■ KRS 527.040 prohibits a specific class of individuals, namely convicted felons, from possessing firearms in the Commonwealth of Kentucky. Decades of decisions have taught us that a statute prohibiting a class of individuals from doing anything must, at a minimum, be based on some rational basis in order to satisfy constitutional standards. *See, e.g., Commonwealth Natural Resources & Env. Protection Cabinet v. Kentec Coal*

*Co., Inc.*, 177 S.W.3d 718, 724–25 (Ky. 2005). In this case, neither party disputes that regulation of firearms among convicted felons is supported by substantial and rational concerns. *See Eary v. Commonwealth*, 659 S.W.2d 198, 200 (Ky. 1983) ("It is our opinion that a statute limiting the possession of firearms by persons who, by their past commission of serious felonies, have demonstrated a dangerous disregard for the law and thereby present a threat of further criminal activity is reasonable legislation in the interest of public welfare and safety...."); *see also*, Philip J. Cook and Jens Ludwig, *Principles for Effective Gun Policy*, 73 Fordham L.Rev. 589 (2004) (stating that gun misuse is concentrated among people with arrest records and arguing that effective gun policy should be designed to increase the "legal liability" to those who misuse guns); Matthew S. Miner, *Hearing the Danger of an Armed Felon—Allowing for a Detention Hearing under the Bail Reform Act for those who Unlawfully Possess Firearms*, 37 U. Mich. J.L. Reform 705 (2004) (arguing that unlawful firearms possession by felons is a serious threat to public safety), Judge Amy Karan and Helen Stampalia, *Domestic Violence and Firearms: A Deadly Combination*, 79 Fla. B.J. 79 (October 2005) (reporting that domestic abusers are more likely to seriously harm or kill somebody if they have access to firearms).

Rather, Appellant contends that the constitution expressly protects the convicted felon's right to bear arms in spite of these substantial risks to public welfare and safety. He points to the plain language of Section 1(7), and argues that when it is read in comparison to another right endowed by the constitution, there can be no

5. Sections 1 through 26 are known collectively as "Kentucky's Bill of Rights."

doubt as to the meaning of the language. We disagree, finding nothing in the constitution, either express or implied, which support Appellant's positions.

First, Appellant argues that the language of Section 1(7) is plain and clear. It declares that all "men" have the right to bear arms in defense of themselves and of the Commonwealth subject only to "the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons." Ky. Const. § 1(7). He argues that use of the word "men" in the modern constitution rather than "citizens"

(the word used in previous versions)[6] implies that the right is meant to encompass all persons and not just those who were endowed with the rights and privileges which were commonly conferred on citizens.[7]

While we agree that it may be reasonable to infer from this language change that the 1890 constitutional convention desired to expand the lot of persons entitled to possess firearms, we disagree that this expansion reasonably or necessarily included convicted felons.[8] It is generally

**6.** The previous version of the constitution read, in pertinent part: "That the right of the *citizens* to bear arms in defense of themselves and the State shall not be questioned." Ky. Const. § 25 (1850) (emphasis added). In 1891, the language we see today was ratified: "All *men* are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: the right to bear arms in defense of themselves and of the State...." Ky. Const. § 1(7) (emphasis added).

**7.** In the 1822 case of *Amy v. Smith*, 11 Ky. (1 Litt.) 326, our predecessor Court wrote:

Before we can determine whether she was a citizen, or not, of either of those states, it is necessary to ascertain what it is that constitutes a citizen. In England, birth in the country was alone sufficient to make any one a subject. Even a villain or a slave, born within the king's allegiance is, according to the principles of the common law, a subject; but it never can be admitted that he is a citizen. One may, no doubt, be a citizen by birth, as well as a subject; but subject and citizen are evidently words of different import, and it indisputably requires something more to make a citizen, than it does to make a subject. It is, in fact, not the place of a man's birth, but the rights and privileges he may be entitled to enjoy, which make him a citizen. The term, citizen, is derived from the Latin word, *civis*, and in its primary sense signifies one who is vested with the freedom and privileges of a city. At an early period after the subversion of the Roman empire, when civilization had again begun to progress, the cities in every part of Europe, either by usurpa-

tion or concession from their sovereigns, obtained extraordinary privileges, in addition to those which were common to the other subjects of their respective countries; and one who was invested with these extraordinary privileges, whether he was an inhabitant of the city or not, or whether he was born in it or not, was deemed a citizen. In England, a citizen is not only entitled to all the local privileges of the city to which he belongs but he has also the right of electing and being elected to parliament, which is itself rather an extraordinary privilege, since it does not belong to every class of subjects.

If we go back to Rome, whence the term, citizen, has its origin, we shall find, in the illustrious period of her republic, that citizens were the highest class of subjects to whom the *jus civitatis* belonged, and that the *jus civitatis* conferred upon those who were in possession of it, all rights and privileges, civil, political and religious.

When the term came to be applied to the inhabitants of a state, it necessarily carried with it the same signification, with reference to the privileges of the state, which had been implied by it with reference to the privileges of a city, when it was applied to the inhabitants of the city; and it is in this sense, that the term, citizen, is believed to be generally, if not universally understood in the United States.

*Id.* at 334.

**8.** The meaning of the word "citizen" as it was construed during the latter half of the nineteenth century reveals a more probable purpose for expanding the language in Section

accepted that certain classes of persons are thought to lack the ability or the natural attributes to possess many of the rights which are recognized under our constitution. For example, none of the parties dispute the premise that children and insane or incompetent persons are likely not endowed with the natural right to bear arms. *See United States v. Emerson*, 270 F.3d 203, 227 n. 21 (5th Cir.2001) (citing numerous authorities which document the fact that "violent criminals, children, and those of unsound mind" were never intended to be conferred with the right to bear arms). Historically, convicted felons were similarly accorded diminished status when it came to being endowed with certain natural rights.

Indeed, the view prevailing at the time our modern constitution was formulated was that felons were not endowed with the natural right to possess firearms. *See Emerson, supra,* at *Id.; State v. Hirsch,* 177 Or.App. 441, 34 P.3d 1209, 1212 (2001) ("Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death.") (quoting Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 Mich. L.Rev. 204, 266 (1983)); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L.Rev. 461, 480 (1995) (reporting that felons did not historically possess a right to possess arms). Thus, without further evidence to suggest that convicted felons were somehow accorded more status by

the 1890 constitutional convention than was historically attributed to them, we cannot say that the use of the word "men" within our modern constitution was intended to necessarily encompass those men who were convicted felons.

Appellant similarly argues that the framers' intent to include convicted felons within the scope of Section 1(7) of the Kentucky Constitution is illustrated by comparison to Section 145 of the constitution. Section 145 describes, in detailed form, the types of "persons" who are entitled to vote in the Commonwealth of Kentucky. It states that these "persons" must be (1) at least eighteen years of age; and (2) be a citizen of the United States of America. It excludes, with specificity, the following "persons": (1) convicted felons; (2) people who are incarcerated at the time of election; and (3) idiots and insane persons. Ky Const. § 145.

Appellant contends that since Section 145 excludes convicted felons with specificity, but Section 1(7) does not, then it must be inferred that Section 1(7) meant to include convicted felons among the class of persons who were entitled to possess firearms. This argument is also flawed. First, it is notable that the right of suffrage is not contained within the sections entitled "Kentucky's Bill of Rights." Rather, it is located within its own section entitled "Suffrage and Elections." [9] Thus, Appellant's "consistency in form" argument is weak since the specimen provisions are found in two completely different sections of the constitution.

1(7) from "citizens" to "men." In order to be considered a citizen during that time, individuals were required to meet a slew of eligibility requirements, including but not limited to: being male, Caucasian, of appropriate age, and a property owner. Use of the word "men" operated to relax some of these onerous requirements. *See Amy v. Smith, supra.*

9. It is also interesting to note that prior to the establishment of one's eligibility and right to vote, the constitution establishes the following: (1) The Bill of Rights (the rights reserved to the people) and (2) the three branches of government—legislative, executive, and judicial.

Moreover, the reason that voting rights exist within a completely different section of the constitution is because voting was not thought to be a natural, inalienable and inherent right of the people (like the right to bear arms) at the time that our modern constitution was drafted. *See* Ky Const. § 1; Volume 1 *Proceedings and Debates of the Constitutional Convention of 1890,* 534 [hereinafter "Debates"] (Delegate Bronston, C.J.) (listing the absolute rights of man); *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (right to vote is "not regarded strictly as a natural right, but as a privilege merely conceded by society"). Rather, voting was a privilege which was conferred to the people through the prudence and consent of the legislature. It is self-evident that a grant of power requires some specificity so as to prevent such power from being swallowed within those powers which have otherwise been limited or reserved. *See Varney v. Justice,* 86 Ky. 596, 6 S.W. 457, 459 (1888). Such specificity is not particularly necessary or desired, however, when it comes to reserving (or perhaps, preserving) the people's natural and inherent rights. *See* Ky Const. §§ 1, 4, 26; 16 Am.Jur.2d *Constitutional Law* § 40 (discussing constitutions as grants or limitations of power); *Cf. The Federalist No. 45,* at 236 (James Madison) ("The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State Governments are numerous and indefinite."). Accordingly, we also cannot infer a clear intent to endow convicted felons with the right to possess firearms by reference to language utilized in a different section of the constitution for a different purpose.

Finally, we find nothing to support Appellant's suggestion that the limiting language concerning "concealed weapons" utilized in Section 1(7) (in conjunction with Section 26) of the constitution somehow divests the legislature of power to reasonably regulate the area of firearms possession. The people's right to bear arms in defense of themselves and of the Commonwealth was first recognized and preserved by our constitution in 1792. Ky. Const. of 1792, art. 12, § 23 ("The rights of the citizens to bear arms in defense of themselves and the State shall not be questioned."). The language as we know it today was ratified in 1891. A review of the debates which accompany the modern formulation of Section 1(7) indicate no intent on the part of the drafters to deem the right to bear arms in Kentucky absolute. *See* Debates, pg. 534 ("and hence arose civil liberty, which is but natural liberty, restrained by the necessities of the public good") (Bronston, C.J.); pg. 557 ("the right to bear arms in defense of themselves and the State, that means on all proper occasions") (Askew, J.F.); pg. 764 ("We are not freemen because we are licensed to do as we please, we are freemen because we are licensed to do what is right according to the law.") (Rodes, Robert); pg. 776 ("I know the object of this is to give every man the right to bear arms in defense of himself, his family, and country.") (Rodes, Robert); pg. 816–17 ("A man, of course, has a right to defend his life and liberty. His right to do it is inherent and inalienable, and he can enjoy that privilege without interfering with anybody else.") (Montgomery, J.F.).

In fact, the concept of an individual right to bear arms sprung from classical republican ideology which required the individual holding that right to maintain a certain degree of civic virtue. *Hirsch, supra,* at 1211 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law & Contemp Probs 143, 146 (Winter 1986) (footnote omitted)); *see also* Saul Cornell and Nathan DeDino, *The Second Amend-*

*ment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives,* 73 Fordham L.Rev. 487, 492 (2004) ("Historians have long recognized that the Second Amendment [of the U.S. Constitution] was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue."). "One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) or those, who, like children or the mentally unbalanced, are deemed incapable of virtue." *Hirsch, supra,* at 1212, *see also* Debates, pg. 764 ("We are not freemen because we are licensed to do as we please, we are freemen because we are licensed to do what is right according to the law.") (Rodes, Robert). This concept of civic virtue is similarly reflected in other provisions contained in Section 1 of our Constitution, such as the rights of all persons to life, liberty, and the pursuit of happiness. Yet, neither party would claim that these rights are absolute or somehow immune from reasonable limitations in the interest of public safety and welfare. *See* Robert M. Ireland, *The Kentucky State Constitution, A Reference Guide* 25 (1999) (commenting that Section 1 "is by no means an unlimited repository of rights against gov-ernment regulation or judicial mandate" and citing to several decisions which uphold reasonable limitations on the rights contained within Section 1).

Moreover, the text in Section 1(7) does not support the notion that a person's right to bear arms is absolute since it plainly states that one may bear arms for the purpose of self-defense and defense of the State. Such language indicates that the right is conditioned on certain self-evident premises—that it be enjoyed lawfully and without undue interference with the rights of others. *See* Debates, pg. 816–17 ("A man, of course, has a right to defend his life and liberty. His right to do it is inherent and inalienable, and he can enjoy that privilege without interfering with anybody else.") (Montgomery, J.F.). Thus, we reject Appellant's contention that our constitution somehow confers on all persons an absolute right to bear arms or that the area of firearms possession is completely exempt from legislative regulation.[10]

■ In essence, Appellant's arguments boil down to mere presumptions or suggestions that could conceivably be inferred by the language present in our modern constitution.[11] However, the mere possi-

---

**10.** Numerous jurisdictions interpreting the right to arms provisions of their state constitutions have held likewise. *See Heidbrink v. Swope,* 170 S.W.3d 13, 15 (Mo.App.2005); *Mosby v. Devine,* 851 A.2d 1031, 1044 (R.I. 2004); *Rohrbaugh v. State,* 216 W.Va. 298, 607 S.E.2d 404, 413–414 (2004); *State v. Hirsch,* 177 Or.App. 441, 34 P.3d 1209, 1211 (2001); *Mosher v. City of Dayton,* 48 Ohio St.2d 243, 358 N.E.2d 540, 543 (1976); *Cf. United States v. Emerson,* 270 F.3d 203, 261 (5th Cir.2001) ("Although, as we have held, the Second Amendment does protect individual rights, that does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right

of Americans generally to individually keep and bear their private arms as historically understood in this country.")

**11.** Appellant's arguments merely highlight the inherent ambiguity contained within Section 1 and within constitutions in general. As an instrument, constitutions are intended to be written with a broad stroke, so as to encompass the general principles and philosophies of societies and the rights of individuals as they are contained therein. *See* 16 C.J.S. *Constitutional Law* § 18 (2005). The rights enumerated in such instruments are not intended to be all-encompassing or absolute, but rather they are understood to be subject to certain well-recognized exceptions, so as to preserve and balance the rights of the collec-

bility that language could be interpreted in a particular way is insufficient to invalidate the plain language of a statute. *Walters, supra,* at 467 (ambiguities are to be resolved in favor of the legislative interpretation). In balance, we defer to the reasonable interpretation of our legislature, finding that the constitution permits some reasonable regulation of the people's right to bear arms, but only to the extent that such regulation is enacted to ensure the liberties of all persons by maintaining the proper and responsible exercise of the general right contained in Section 1(7). *See, e.g.,* KRS 237.060 (prohibition against armor-piercing ammunition); KRS 237.090 (providing for the disposition of forfeited firearms or ammunition); KRS 527.020 (making it unlawful to possess firearms or other weapons on school property); KRS 527.100 (prohibiting the possession of handguns by minors). Under no circumstances may regulation by the legislature be enacted for an arbitrary or irrational purpose, nor may it unduly infringe upon the general exercise of this right as it was envisioned and preserved pursuant to Section 1(7) of the Kentucky Constitution.

With this standard in mind, and considering that the vast majority of persons living in this Commonwealth are law-abiding and responsible individuals, we ultimately determine that the regulation contained within KRS 527.040 is not arbitrary or irrational and does not unduly infringe upon the right to bear arms which was reserved to the people through Section 1(7) of our constitution. As previously stated by this Court, KRS 527.040 is "reasonable legislation in the interest of public safety." *Eary, supra,* at 200. Since nothing in the constitution, either express or implied, undermines or prohibits such legislation, we find KRS 527.040 to be constitutional.

The decision of the Court of Appeals is affirmed.

LAMBERT, C.J., COOPER, GRAVES and WINTERSHEIMER, JJ., concur.

ROACH, J. concurs in a separate opinion in which JOHNSTONE, J., joins.

SCOTT, J., concurs in part and dissents in part by a separate opinion.

ROACH, Justice, concurring.

I concur in the result reached by the majority opinion. However, I write separately to address the constitutionality of KRS 527.040. Ultimately, I think a proper historical understanding of the rights described in Section 1 of the Kentucky Constitution, particularly as they related to criminals, provides the sole ground necessary for the statute to withstand a constitutional challenge.

At first blush, Appellant's semantic argument seems compelling based on the facts that the rights contained in Section 1

---

tive with the rights of the individual. *See, e.g., Robertson v. Baldwin,* 165 U.S. 275, 17 S.Ct. 326, 329, 41 L.Ed. 715 (1897) (interpreting the U.S. Bill of Rights) ("Thus, the freedom of speech and of the press (article 1) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputation; the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons; the provision that no person shall be twice put in jeopardy (article 5) does not prevent a second trial, if upon the first trial the jury failed to agree, or if the verdict was set aside upon the defendant's motion; nor does the provision of the same article that no one shall be a witness against himself impair his obligation to testify, if a prosecution against him be barred by the lapse of time, a pardon, or by statutory enactment. Nor does the provision that an accused person shall be confronted with the witnesses against him prevent the admission of dying declarations, or the depositions of witnesses who have died since the former trial.") (citations omitted).

of the Kentucky Constitution are for "all men," and, more specifically, that the subsection on the right to bear arms reserves to the General Assembly only the power to regulate the carrying of concealed weapons. But Appellant's argument fails when these rights are understood in the context of the common law when the Constitution was adopted in 1891.

At the Constitutional Convention of 1890, Robert Rodes served as the Chairman of the Committee on Preamble and Bill of Rights. Rodes described the seven subsections of Section 1 of the Constitution of Kentucky as a "general statement of our rights." 2 *Official Report of the Proceedings and Debates in the Convention Assembled at Frankfort, on the Eighth Day of September, 1890, to Adopt, Amend or Change the Constitution of the State of Kentucky*, at 435 (1890). He then described these rights, which he also claimed belong to "free men," as "certain inalienable and indefeasible rights." *Id.* at 436. In particular, Rodes traced these rights to the Magna Charta and the English Bill of Rights. *Id.* at 444–46; *see also* Ken Gormley & Rhonda G. Hartman, *The Kentucky Bill of Rights: A Bicentennial Celebration*, 80 Ky. L.J. 1, 5 (1990–91) ("Specifically, an examination of the Kentucky Bill of Rights of 1792 shows that it may be traced ultimately to the Magna Charta and the English Bill of Rights."). Thus, Section 1 concerns a group of rights that were commonly called the rights or liberties of Englishmen, *see* 1 William Blackstone, *Commentaries on the Laws of England* *144 (describing "the rights, or, as they are frequently termed, the liberties of Englishmen...."), which included the specific right to bear arms. *See id.* at *143–44 ("The fifth and last auxiliary right of the subject ... is that of having arms for their defence....").

As pointed out by the majority opinion, felons did not have the right to possess firearms at common law. *See also* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L.Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). In fact, felons were stripped of all rights of station under the common law. Vernon M. Winters, Note, *Criminal RICO Forfeitures and the Eight Amendment: 'Rough' Justice Is Not Enough*, 14 Hastings Const. L.Q. 451, 457 (1987) ("A felon who had broken the social contract no longer had any right to social advantages, including transfer of property, and people believed that punishing the felon as well as his ancestors and heirs would serve as a more effective deterrent than would personal punishment alone." (footnote omitted)). In essence, a felon "could not own any property himself, nor could any heir born before or after the felony claim through him." 3 William S. Holdsworth, *A History of English Law* 69 (3d ed. 1927) (footnote omitted). This harsh treatment of felons was due to the legal effect of the felon's "blood [being] corrupted or attainted." *Id.* Blackstone explained the reason behind the treatment as follows:

The true reason and only substantial ground of any forfeiture for crimes consist in this; that all property is derived from society, being one of those civil rights which are conferred upon individuals, in exchange for that degree of natural freedom, which every man must sacrifice when he enters into social communities. If, therefore, a member of any national community violates the fundamental contract of his association, by transgressing the municipal law, he forfeits his right to such privileges he claims by that contract; and the state

may very justly resume that portion of property, or any part of it, which the law assigned him.

1 William Blackstone, *Commentaries on the Laws of England* *299–300.

The severe concept of attainder, or corruption of blood, was not carried over into the law of the United States, see U.S. Const. art. III, § 3 ("[N]o Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person Attainted."), or that of the individual states, including Kentucky. *See* Ky. Const. § 20 ("No person shall be attainted of treason or felony by the General Assembly, and no attainder shall work corruption of blood, nor, except during the life of the offender, forfeiture of estate to the Commonwealth."). Despite the exclusion of this harsh doctrine, the law in the United States still allowed for significant limitations on the rights of felons. Thus, while the law could allow for forfeiture of the felons' property, it simply could not affect their heirs.

The American colonists and early American citizens also understood that this deprivation of rights extended to the right to bear arms. Consider the following example: Part of the fight over ratification of the United States Constitution was the anti-Federalists' concern that it did not contain a bill of rights. Several days after the Pennsylvania Convention voted 46 to 23 to ratify the Constitution, twenty-one of the Convention's minority members issued a dissenting address calling for a Bill of Rights. Included in their proposed list of rights was a right to bear arms that stated in part: "[N]o law shall be passed for disarming the people or any of them, *unless for crimes committed,* or real danger of public injury from individuals. . . ." The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, 1787 (emphasis added), *excerpts reprinted in* Bernard Schwartz, *The Bill of Rights: A Documentary History 665 (1971).* There is little doubt that the citizens of the early United States were sensitive to the possible deprivation of their rights and liberties at the hands of the newly-formed federal government. It is equally clear, however, that their concern did not extend to the rights and liberties of criminals.

Further, this approach makes sense, especially when one considers the simple fact that felons are no longer "free men" under the criminal law. The very nature of the criminal law requires limitations on the rights of those convicted, either through limitations on liberty (imprisonment) or property (fines), as punishment. Limitations on the right to bear arms are part and parcel of that deprivation of rights. Since felons at common law were stripped of their privileges and rights, they are not entitled to the right to bear arms under Section 1(7) of the Constitution of Kentucky. Therefore, I concur in the majority opinion's conclusion that KRS 527.040 is constitutional.

JOHNSTONE, J., joins this concurring opinion.

SCOTT, Justice, concurring in part and dissenting in part.

I concur in the majority's opinion regarding the Fourth Amendment issue, but I dissent on the constitutional rights of "self-defense" and to "bear arms."

It is simply wrong to arrest, charge and convict Kentuckians of "felony crimes" for keeping a weapon in their own home— without any evidence the weapon was intended to be used for unlawful purposes. Such a practice violates all of our rights to "bear arms in defense of [ourselves and others]" and our rights of self-defense. See Ky. Const. § 1(1, 7). Thus, I write

separately to remind Kentuckians of what our forefathers left us in the Bill of Rights under our Kentucky Constitution.

While writing this dissent, I noticed in the Appalachian News–Express of December 21, 2005, that Peggy Ligon, 27, pled guilty in the McCracken Circuit Court to *the felony of reckless homicide* in connection with the death of a five year-old boy, who was hit while crossing a street under her care.

Moments before he was hit, she told the child and four other children that it was okay to cross the street. She and the children had just started to cross when the child left her side and was struck by a pickup truck driven by a young man from Paducah. The young man was not charged. However, the child's mother said after the hearing that she had asked that the charge against Ligon be dropped. "We never blamed her for the accident," she said. However, the charge was not dropped and Peggy Ligon is now a "convicted felon." *Woman Pleads Guilty to Reckless Homicide in Child's Death,* Appalachian News–Express, December 21, 2005, at 11A.

Peggy Ligon, now a "convicted felon," has no further right under the laws of Kentucky to keep a firearm in her home to defend herself, or her children, irrespective of how dangerous a neighborhood she might live in. Nor, as the majority should concede, does she have a right to live in a house with *any other person who possesses a firearm,* since that would constitute her "constructive possession" of the weapon, rendering her liable again for unlawful possession of a weapon by a "convicted felon."

In this case, Mr. Posey was arrested in his own home.[1] When asked, after his arrest, if he had any weapons, he told the officers there was a pistol in the back room. From his record, it appears Mr. Posey is an addict. Thus, he was sentenced to four years in the penitentiary, probated, however, on the condition that he serve six-months in the Jefferson County Jail with work release and otherwise comply with other conditions established by the court to keep him clean from drugs and law abiding. Background information indicated he had served his country well in the military, receiving an honorable discharge. He was a high school graduate and had had steady employment throughout the years. Yet, because he had a weapon in his house—though in another room—he was charged with another felony crime.

Several premises underlie all arguments supporting disarmament of various segments of American society. One is that criminals *will abide* by our gun laws. The second and most subtle is that the police forces of society *can adequately protect us at all times anyway*—whether in our homes, workplaces, or places of enjoyment.

While these thoughts are comforting, each daily read of one's newspaper proves otherwise—not to mention the multitude of violent crimes we deal with in our courts each year, most of which are not reported in the papers. All of this, while many states have enacted statutes designed to keep guns out of the hands of violent criminals. Yet, the continuing violent crime just proves the point, that *once you outlaw guns, only outlaws will have them.*

My experience in life leads me to believe that the only successful way to keep "hardened criminals" away from weapons and "hurting people"—is to put them in prison where they can't hurt anybody else. *We don't need to take away someone else's*

---

1. The amount of marijuana in his and his friend's possession was less than 1/2 ounce.

*right to defend themselves, or their family, to do that.*

I believe we must continue to punish, *or even increase punishment,* for those who misuse weapons in an unlawful manner. *See* KRS 218A.992 (enhancement of offense if in actual[2] possession of a firearm during drug trafficking), KRS 532.045(2)(d) (use of a deadly weapon against a minor during an offense), KRS 533.060(1) (enhanced sentencing for use of a firearm during an offense), KRS 533.065 (wearing body armor and carrying deadly weapons during offense), and KRS 635.020(4) (use of firearm by child during a felony). However, I do not believe it is constitutionally valid to disarm, or imprison, those who would keep weapons for a purpose they hope will never occur—the defense of themselves and their families.

As of the 2000 census, Kentucky had a population of 4,041,769 people in an area of 40,395 square miles. Yet today, there are only 943 Kentucky State troopers available for patrol and response, and even they are divided into several work shifts per day. *http://www.kentucky statepolice.org/pdf /crimefacts2004.pdf* at 111. Other areas, such as cities and counties, have supplemental police forces, but they too are limited in numbers and response time. And I might add—finance.

The point is that violence is most often quick, unpredictable and unexpected. Thus, it is up to each of us to defend ourselves and our families, if we can, until help (the police) can arrive. Because of *this need,* our forefathers made sure in 1891 that the "right of self-defense" and the "right to bear arms" were engraved deeply in our Constitution, Section 1(1–7), as well as our statutes. *See* KRS 503.070.

KRS 527.040, however, seeks to disarm all "convicted felons" by rendering their possession of firearms a further felony crime—as in this case. *The question then becomes (1) are "convicted felons" truly a class we need to deprive of firearms? and (2) if so, is it constitutional to do so under our State Constitutional Bill of Rights? See Ky. Const., § 1(1 & 7), 26.*

We are not presented here with questions involving the Second Amendment to the United States Constitution.[3] Nor, are we presented with any question relating to the comparative federal statute, 18 USCA § 922(G) prohibiting possession of weapons by "convicted felons," which still applies today to "convicted felons" under fed-

**2.** *Commonwealth v. Montaque,* 23 S.W.3d 629, 632 (Ky.2000) ("The statute requires a nexus between the crime committed and the possession of a firearm.").

**3.** For a summary of the arguments addressing the Second Amendment to the United States Constitution, see *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *Silveira v. Lockyer,* 312 F.3d 1052 (9th Cir. 2003) and *United States v. Emerson,* 270 F.3d 203 (5th Cir.2001). *See also* Van Alstyne, *The Second Amendment and the Personal Rights to Bare Arms,* 43 Duke L.J. 1236 (1994); Akhil Reed Amar, *The Bill of Rights and the Fourteen Amendment,* 101 Yale L.J. 1193 (1992); Robert Cottrol & Raymond Diamond, *The Second Amendment: Towards an Afro–Ameri-* *canist Reconsideration,* 80 GEO. L.J. 309 (1991); Sanford Levinson, *The Embarrassing Second Amendment,* 99 Yale L.J. 637 (1989); Don Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 Mich. L.Rev. 204 (1983); *compare with,* Glen Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L.Rev. 461 (1995), Saul Cornell and Nathan DeDina, *The Second Amendment and the Future of Gun Regulation: Historical Legal, Policy and Cultural Perspectives,* 73 Fordham L.Rev. 487 (2004); Carl Bogus, *Race Riots and Guns,* 66 S.Cal. L.Rev. 1365 (1993); David Williams, *Civic Republicanism and the Citizen Militia: the Terrifying Second Amendment,* 101 Yale L.J. 551 (1991).

eral law,[4] even though the United States Supreme Court has yet to specifically rule on its validity. As Justice Thomas noted in his concurring opinion in *Printz v. United States*, 521 U.S. 898, 938–39, 117 S.Ct. 2365, 2386, 138 L.Ed.2d 914 (1997), at Fn. 1:

> In *Miller*, we determined that the Second Amendment did not guarantee a citizens right to possess a sawed-off shotgun because that weapon had not been shown to be "ordinary military equipment" that could "contribute to the common defense." The court did not, however, attempt to define, or otherwise construe, the substantive right protected by the Second Amendment.

Justice Thomas went on to say:

> This Court has not had recent occasion to consider the nature of the substantive right safeguarded by the Second Amendment. If, however, the Second Amendment is read to confer a *personal* right to "keep and bear arms," a colorable argument exists that the Federal Government's regulatory scheme, at least as it pertains to the purely intrastate ... possession of firearms, *runs afoul of that Amendment's protections.* As the parties did not raise this argument, however, we need not consider it here. Perhaps, at some future date, this Court will have the opportunity to determine whether Justice Story was correct when he wrote that the right to bear arms "has justly been considered, as the palladium of the liberties of a republic."

*Id.* at 938–39, 117 S.Ct. 2365, (citing, 3 J. Story, *Commentaries* § 1890, 746 (1833) (emphasis added)).

Aside from what the United States Supreme Court may say on the Second Amendment *in the future*, one must recog-nize our state constitution is much different in rights, language, and structure than the Constitution of the United States.

Thus, as there is no "federal question" involved in this case, we must consider whether Kentucky's statute, KRS 527.040, prohibiting possession of a weapon by a "convicted felon," is valid under the Constitution of Kentucky, which has a Bill of Rights specifically guaranteeing the "right to bear arms," Ky. Const. § 1(7), as well as the "right of self-defense." Ky. Const. § 1(1). KRS 527.040 was first enacted in 1974. *It is the first, and only, statute in the history of Kentucky making possession of a firearm, other than a concealed weapon, a crime.* It provides, in part:

> (1) A person is guilty of possession of a firearm by a convicted felon when he possess, ... a firearm when he has been convicted of a felony, ... and has not:
> (a) been granted a full pardon....
> (2) Possession of a firearm by a convicted felon is a Class D felony unless the firearm possessed is a handgun in which case it is a Class C felony.

A pistol is a handgun. KRS 527.010(5).

The "police power," upon which the validity of KRS 527.040 rests, arises under Section 29 of the Kentucky Constitution. Section 29 provides: "The legislative powers shall be vested in a House of Representatives and a Senate, which, together, shall be styled the 'General Assembly of the Commonwealth of Kentucky.'" "The words 'the legislative power,' as here employed, are a comprehensive phrase, meaning all powers that appertain to, or are usually exercised by, a legislative body." *Booth's Ex'r v. Commonwealth*, 130 Ky. 88, 113 S.W. 61, 62 (Ky.1908). "We hold that [KRS 527.040] is ... a valid exercise of the police power of the Commonwealth

---

4. *United States v. Napier*, 233 F.3d 394, 404 (6th Cir.2000) ("This state constitutional provision, [the Kentucky constitutional 'right to bear arms'] however, is trumped by the Su-premacy Clause of the United States Constitution, which provides the federal law 'shall be the supreme Law of the Land....'").

of Kentucky." *Eary v. Commonwealth*, 659 S.W.2d 198, 200 (Ky.1983). Thus, the police power "[i]s a legislative power, and when the people, by their Constitution, create a department of government upon which they confer the power to make laws, the power ... is conferred as part of the *more general power.*" *Booth's Ex'r*, 113 S.W. at 62, 63 (emphasis added).

To fully consider the conflict between KRS 527.040 and our "Bill of Rights," we must understand the term "felony." And we must fully understand the meaning and impact of our Bill of Rights, Section 1(1, 7) and 26.

To do this, we must review the "history of the times," the "First Amendment and its contextual relationship within the Kentucky Constitution" and the "historic comments of our forefathers" (who drafted our Constitution) from the recorded Constitutional Debates of 1849 and 1890, so that we might understand what they meant and intended by selection of the language they used. And we must look at our "older decisions" (our precedents), so we can better understand *what the court felt about these rights* at a time much closer to the time they were created.

### CONVICTED FELONS

Let's start with the term "convicted felon." Peggy Ligon is a "convicted felon,"

but who else would qualify? A felony is "an offense for which a sentence to a term of imprisonment of at least one (1) year in the custody of the Department of Corrections may be imposed." KRS 500.080(5). Thus a "convicted felon" is a person who has been convicted of a "felony." Suffice it to say the number of various felonies today, from Class D felonies (the lowest) to capital crimes (the highest), both Federal and State, *exceed listing on this and the next several pages.*

They include bigamists, people who dig for Indian artifacts on public lands, people who falsify their purchase price in deeds and vehicle registration, etc., all the way up to murder.[5] But there are many more of the "lower," than the "higher."

With an inkling of the vast area of non-threatening human activity covered by the term "felony," and thus the extent of the broad coverage of KRS 527.040, let us consider its proscriptions within the context of our Kentucky Constitution Bill of Rights.

### THE BILL OF RIGHTS AND THE CONSTITUTIONS OF KENTUCKY

The Bill of Rights to the Kentucky Constitution is contained in Sections 1 through

---

**5.** It would take too many pages to list them all, but they run from exploring and digging for artifacts on public lands, KRS 164.990(1), failure of athletic agents to notify a college or university of agency contracts with athletes, KRS 164.689(3), unauthorized copying of records or videos, KRS 434.445, willfully removing or damaging boundary markers, KRS 433.770(1), through bigamy, KRS 530.010, and campaign finance violations, KRS 121.90, cremation without obtaining permission of a coroner, KRS 213.991, improper testing of blood samples, KRS 214.990(7), receiving deposits in failing financial institutions, KRS 517.100, treatment of cancer by non-physicians, second offense KRS 211.990(3), computer hacking, KRS 434.850, and 434.855, gambling, KRS 528.040, false purchase price information or value on deeds, KRS 387.990, flagrant non-support, KRS 530.050, reckless homicides involving vehicle accidents, KRS 507.050(1), joy riding, KRS 514.100, mining violations, KRS 351.990, public assistance violations, KRS 205.990, giving false statement as to amount paid for motor vehicle, KRS 138.990(10)(a) and failure to file, or pay income tax, KRS 141.990(5), all the way up to the violent homicides in KRS Chapter 507, the overwhelming majority of which, by classification, do not involve, or portend, any threat of violence or threat to the safety of the public.

26. Section 1(1, 7), in relevant part, provide:

All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:

*First:* The right of enjoying and defending their lives and liberties.

. . . .

*Seventh:* The right to bear arms in defense of themselves . . ., subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons.

The last Section of the Bill of Rights, Section 26, *(the "high powers clause")* provides:

To guard against transgression of the high powers which we have delegated, We Declare that every thing in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution shall be void.

Now let's look at its history. Although the first (and foremost) right to today, the "right of self-defense," Section 1(1), did not appear in the first Constitution of Kentucky in 1792, the "right to bear arms," Section 1(7), did, (as Section 23 of Article XII), which at the time read, "[t]he rights of the citizens to bear arms in defense of themselves and the State shall not be questioned." The "high powers clause" also appeared in the first Constitution (as Section 28 of Article XII thereof), standing guard against invasion of the liberties protected by the Bill of Rights. In fact, the language we see in the "high powers clause" today is the same language that appeared in 1792, 1799 and 1850.

The "right to bear arms" also appeared in the Second Constitution of Kentucky in 1799. It was the same language and the same section numbers, albeit under Article X. Section 1(1), the "right of self defense," as we know it today, *was still absent.*

It is noteworthy that several years after the adoption of the second Kentucky Constitution in 1799, the Kentucky legislature passed an act "to prevent persons in this Commonwealth from wearing concealed arms." *Bliss v. Commonwealth,* 2 Litt. 90, 12 Ky. 90 (Ky.1822). The Act provided "that any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey, shall be fined in any sum not less than one hundred dollars." *Id.* The indictment in *Bliss* charged him with having worn a sword in a cane, concealed as a weapon.

Commenting in 1822 on the right of the citizens to bear arms in defense of themselves, our predecessor court *held the act unconstitutional* in violation of Section 1(7), the constitutional "right to bear arms," as well as the "high powers clause," stating:

[I]t is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. Not merely all legislative acts, which purport to take it away; but all which diminish or impair it as it existed when the constitution was formed, are void.

. . . .

The right existed at the adoption of the constitution; it had then no limits short of the moral power of the citizens to exercise it, and it in fact consisted in nothing else but the liberty of the citizens to bear arms. Diminish that liberty, therefore, and you neces-

sarily restrain the right; and such is the diminution and restraint, which the act in question most indisputably imports, by prohibiting the citizens wearing weapons in a manner which was lawful to wear them when the constitution was adopted.

. . . .

[I]t should not be forgotten, that it is not only a part of the right that is secured by the constitution; it is the right entire and complete, as it existed at the adoption of the constitution; and if any portion of that right be impaired, immaterial how small the part may be, and immaterial the order of time at which it be done, it is equally forbidden by the constitution.

*Id.* at 91–92.[6]

Twenty-eight years later in 1850, Kentucky adopted its third Constitution. Section 1(1), the "right of self-defense," *was still absent,* but the "right to bear arms" and the "high powers clause" remained in Article XIII. Yet, several notable changes occurred. Dueling was outlawed. Ky. Const. art. VIII, § 20 (1850). Also, the right to bear arms, then Section 25 of Article XIII, was amended to authorize laws prohibiting persons from carrying concealed arms, thereby abrogating the ruling in *Bliss.*

Thus, language was added and the "right to bear arms" in the 1850 Constitution thereafter read "[t]hat the rights of the citizens to bear arms in defense of themselves and their State shall not be questioned; but the General Assembly

may pass laws to prevent persons from carrying concealed arms." Ky. Const. art. XIII, § 25 (1850).

Our fourth and current Constitution was adopted and ratified on August 3, 1891. *For the first time, we see the Bill of Rights, Sections 1 through 26 moved to the forefront of the Constitution.* We see a new preamble. And we see (for the first time) grouped together, the seven "inherent and inalienable" rights of the new First Section of our Bill of Rights, to wit:

All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: . . .

*First:* The right of enjoying and defending their lives and liberties.

*Second:* The right of worshiping Almighty God according to the dictates of their consciences.

*Third:* The right of seeking and pursuing their safety and happiness.

*Fourth:* The right of freely communicating their thoughts and opinions.

*Fifth:* The right of acquiring and protecting property.

*Sixth:* The right of assembling together in a peaceable manner for their common good, and of applying to those invested with the power of government for redress of grievances or other proper purposes, by petition, address or remonstrance.

*Seventh:* The right to bear arms in defense of themselves and of the State, subject to the power of the General As-

---

**6.** For a contrary decision of the time, see *Aymette v. State of Tennessee,* 2 Hum. 154, 21 Tenn. 154 (Tenn.1840) ("we are aware that the Court of Appeals in Kentucky, in the case of *Bliss v. Commonwealth,* 2 Litt. 90, 12 Ky. 90, has decided that an act of their legislature, similar to the one now under consideration, is unconstitutional and void. We have great respect for the court by whom that decision was made, but we cannot concur in their reasoning."). The language under consideration in *Aymette* read, "that the free white men of this State shall have a right to keep and bear arms for their common defense." In *Aymette,* the defendant wore a bowie knife concealed under his clothes, contrary to the then Tennessee concealed weapons statute.

sembly to enact laws to prevent persons from carrying concealed weapons.

*For the first time we have an explicit "right of self-defense" in the First subsection of Section 1, "the right of enjoying and defending their lives and liberties."* The "high powers clause," Section 26, remained unchanged, *declaring that the Bill of Rights "shall forever remain inviolate: and all laws contrary thereto or contrary to this Constitution, shall be void."*

Though we have had many constitutional amendments since then there have been no revisions or amendments to *these sections.*

## DEBATES AT THE KENTUCKY CONSTITUTIONAL CONVENTION OF 1890

"It is a familiar aid in the interpretation of a provision of a constitution to examine the proceedings of the convention. If they clearly reveal the purpose of the particular provision the debates will be accepted as an indication of [their] meaning...." *Barker v. Stearns Coal & Lumber Company,* 287 Ky. 340, 152 S.W.2d 953, 956 (1941).

Interpretations of Constitutions by rules of implication are most hazardous, and, if ever employed at all, it ought to be done in those instances only where the subject-matter and language leave no doubt that the intended meaning of the clause which may be under investigation may be reached in that way only, and be reached that way with approximate certainty. *Cumberland Telephone & Telegraph Company v. City of Hickman,* 129 Ky. 220, 111 S.W. 311, 313, 129 Ky. L.Rptr. 730 (Ky.1908).

"A constitutional provision which is positive and free from all ambiguity must be accepted by the courts as it reads, and should be applied rather than construed. In such a case no construction is permissible, and there is no excuse for interpola-

tion or addition." Am.Jur.2d Vol. 16, *Constitutional Law,* § 60, p. 429–30.

Delegate C.T. Allen, from Caldwell County, a member of the Committee on the Preamble and the Bill of Rights for the 1890 Constitutional Convention, explained this First Section to the delegates at the convention:

I tell you, my friends, the idea is growing in this country that the Government is a "bigger thing" than we ever thought it was; that the individual is of small considerations.... That is the reason why this Committee [on the Bill of Rights] has brought to the front the individual; and in the very outset of our Government we say, that the individual has certain inalienable and inherent rights that nobody, that no Government, can take from him.... We thought it advisable, in the present juncture of affairs, to bring that individual to the front and magnify him; yea, if you please, glorify him. And at the very start of the great Declaration of Rights we say, that the individual has seven inherent, inalienable rights, and that no State government, that no county government, that no city government, that no district government, can ever take from him ... If we have left out one single inalienable and inherent right that belongs to the individual, and of which he can not be deprived, tell me what it is, and I will vote to add an eighth paragraph to this section. What are the inalienable and inherent rights ...? *The first and nearest one is.... The right of enjoying and defending his life. Whether he be saint or sinner, Protestant or Catholic, or what not, the first inalienable right he has, and [right] to be protected in, is that of enjoying and defending his life.... Seventh—and while enjoying all these rights ... he has the right to bear arms in defense of himself, his*

*family and his state, and no man can take it away* .... Like the Pleiades that shine with unspeakable splendor in the midnight sky, attracting the attention of every eye that is cast thitherward, so these seven inalienable and inherent rights, the Pleiades of individual liberty, shine as a group in the galaxy of civil liberty.... It strikes me as a good picture—one decidedly appropriate in these days of degeneracy, when government is drifting on to greater power than anybody every dreamed of, and the individual is almost lost sight of....

. . . .

*The Bill of Rights of the Committee gives it as an inalienable right to every individual to carry arms openly to defend not only himself, but his family and the State.*

*Debates Constitutional Convention,* 1890, Ky. Vol. I, 494–497. (Emphasis added).

. . . .

Great God, the eloquence in those words! "Crown jewels," the gentlemen said, "gathered from the caskets of liberty, where all found a home and resting-place."

*Id.* at 500.

. . . .

It is important to know what we are. Like the seven inalienable and inherent rights of man, *the [right] to be stated so clearly and so distinctly, and so intelligibly, that everybody in the land, in his common school-house can see what they are* ....

*Id.* at 504–505. (Emphasis added).

. . . .

What was the motive and end sought by the Committee when, in the first section, they stated the seven inalienable and inherent rights of freemen? *It was that every man, high and low, lettered and unlettered, could see at a glance, and take in in one moment, all his rights, inalienable and inherent* ... I say, and I submit it to the intelligence of this Convention, have we not gained a point over the old when you group these sacred, inherent and inalienable rights, *so that the eye of the unlettered can see them at a glance and take them in, and the boys of the country may know and understand them.*[7]

*Id.* at 505. (Emphasis added).

Delegate Charles J. Bronston, at the time a Fayette County Commonwealth Attorney, spoke to the convention as to the purpose of the "high powers clause," Section 26:

That is the beginning. What is the end?[8] "To guard against transgression of the high powers which we have delegated to our representatives, *we declare* that every thing in this article," this residuum of liberty, "is excepted out of the general powers of government, and shall forever remain inviolate."[9] *We will not submit to the fluctuations of the future. Majorities might arise that would undertake to infringe upon these liberties which we seek to secure, and, therefore, we will not submit them to the rule of the majority.*

*Id.* at 535. (Emphasis added).

The foregoing was entirely consistent with what Delegate C.A. Wickliffe, of Nelson County, had stated to the 1849 Constitutional Convention:

7.  Mr. Allen was met with applause by the convention at the conclusion of his remarks. *Id.* at 505.

8.  Referring to the Preamble of the Kentucky Constitution of 1891.

9.  Ky. Const., § 26 (1849).

Sir, I yield to no man in this body in devotion to the just democratic principle, which lies at the foundation of free governments, that the majority shall rule. But Sir, to secure that principle in its free and beneficial exercise, I claim ..., that in forming an organic law, we should take care to insert a rule for the guidance of that majority. Popular majorities need a rule of action by which to be governed.

....

Our Constitution is made not so much for the benefit for the majority in the community, as it is to protect the rights of the minority....

....

The judiciary is the political ark of the poor man, to which he must flee in times of danger; the shield by which he is to resist attempts of power to deprive him of his rights.

*Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Kentucky,* 149–150 (1890).

### THE HISTORY OF THE TIMES

"[I]n construing constitutional provisions, [the courts] will look to the history of the times and the state of existing things to ascertain the intention of the framers of the constitution and the people adopting it ..." *Shamburger v. Duncan,* 253 S.W.2d 388, 390, 391 (Ky.1952), citing *Keck v. Manning,* 313 Ky. 433, 231 S.W.2d 604 (1950). The meaning of a constitutional provision does not change as conditions change, and the public policy declared

therein, may not be changed by the legislature, or by the courts, *but only by formal amendment. City of Louisville v. Presbyterian Orphans Home Society of Louisville,* 299 Ky. 566, 186 S.W.2d 194, 200 (1945).

Why were the founders of our first Constitution in 1792, so concerned about the "right to bear arms?" [10] Let's look at the circumstances of their life on the frontier to find out.

In 1792, Kentucky had a population of 73,000 people.[11] Thomas D. Clark, *A History of Kentucky* 96 (1988). "No adult Kentuckian in 1792 had been born in Kentucky." Lowell H. Harrison, *Kentucky's Road to Statehood* 130 (1992).

Parties of [I]mmigrates floating down the Ohio River were attacked constantly by Indians. So flagrant did these attacks become that Judge Harry Inne's [a delegate to the Kentucky Constitutional Convention in 1890] comment in a letter to [United States] Secretary of War Knox, estimated that 1,500 persons had been killed or captured between 1783 and 1790. He estimated further that 20,000 horses and property worth over 15,000 pounds had been stolen or destroyed.

*Id.* at 99.

"Making a living was a simple process, for the pioneer and his family were perfectly satisfied with what the seasons and the rifle brought them." *Id.* at 68. "Distinction in social rank was the exception rather than the rule, for one man's rifle

---

**10.** The United States Constitution recognizes the federal need for quickly formed militias (i.e., the revolutionary war battles of Lexington and Concord)—thus the need for citizens to have and be adept with weapons. State constitutions generally address the rights of the people to protect themselves, their families and the states.

**11.** Kentucky built the first prison west of the Allegheny Mountains in Frankfort in 1799 and imprisoned its first inmate in 1800. Robert G. Lawson, *Difficult Times in Kentucky Corrections,* 93 Ky. L.J. 305. The inmate population was only 200 by 1865. *Id.* at 322.

was as effective as another's, if both were good shots." *Id.* at 70.

Ann Wilkinson wrote her father from Lexington on September 25, 1789, "it is astonishing how fast this Town improves. It is by far the largest in the District ... it is expected that Emigration this fall will be grater [sic] than ever. Report says there are Seventy families in the Wilderness now on there [sic] way to Kentucky." *Id.* at 9. "The 1790 census credited Lexington with 834 inhabitants." *Id.*

In "Oct. 1792, ten Indians attacked [a] party of travelers at Oven Spring [near Legrand, in Hart County, Kentucky]. Two men and one woman were killed, a girl and woman captured...." *http://www.kentucky. gov/Kyhs/hmdb/marker search.aspx?mode subject&subject=107,* marker # 1414. "[A] group of fifteen Indians attacked Severn's Valley [present day Elizabethtown, Kentucky] in 1792 and killed two women and five children, as well as slaughtering livestock and burning down several cabins." John. E. Kleber, *The Kentucky Encyclopedia, Hardin County,* 404 (1992).

Morgan's Station—near Mt. Sterling— was attacked by Indians on April 1, 1793. "19 women and children captured while men worked in fields.... 12 of the pris-

oners were massacred." *http://www.kentucky. gov/Kyhs/hmdb/marker search. aspx?mode subject&subject=107,* marker # 115. "During the Indian troubles of 1791–94, the general government [of Kentucky] authorized that 19 men should be stationed at the mouth of Salt River, 10 at Severn's Valley [E-town] and 12 at Hardin Settlement." *http://www.kentucky genealogy.org/meade /indian_battles.htm.*

After Kentucky became a state in 1792, and adopted its first Constitution, it was abutted north of the Ohio River by the Northwest Territory until 1800. Thereafter, by the Indiana Territory until 1816 and the Illinois Territory until 1818. Indiana did not become a state until 1816 and Illinois not until 1818. Not until the battle of "Fallen Timbers," in 1794 *where sixteen hundred Kentuckians fought,* did the conflict with the American Indians in these northern territories even *began to subside,* although they did not end. Allen W. Eckert, *That Dark and Bloody River,* 609 (1995).

For a better feel of what it was like on the frontier, during the time of Constitution building, one needs to read the dates and places of capture of the captives from Kentucky returned after the battle of "Fallen Timbers." [12]

12. "A complete list of all the prisoners surrendered to [General Anthony] Wayne is not known by the author [Allen W. Eckert] to exist, but from an examination of the various reports that have been made, the following list of known information has been constructed by the author. Age, if given, was the individual's age at the time of capture: Altonton, Mary Ann, captured April 1, 1793, at Morgan's Station, Ky. Anthony, Elizabeth, captured March 26, 1793, on the Wilderness Road in Kentucky. Armstrong, John, capture date unknown; surrendered by Detroit River Wyandots. Ashby, David, 13, captured August 9, 1790, in Madison Co., Ky; surrendered September 14, 1795, by St. Joseph Potawatomies. Anther Ashby, David, captured in May 1788 on Ohio River near mouth of

Kentucky River. Ashby, Enoch, captured in May 1788 on Ohio River near mouth of Kentucky River. Ashby, Polly, captured in May 1788 on Ohio Rover near mouth of Kentucky River. Ashby, Robert, captured in May 1788 on Ohio River near mouth of Kentucky River. Ashby Susannah, captured in May 1788 on Ohio Rover near mouth of Kentucky River. Ashby, Thomas, captured in May 1788 on Ohio River near mouth of Kentucky River. Baldwin, Betsy, captured in Kentucky. Barker, Susannah, captured April 1, 1793, at Morgan's Station, Ky.; surrendered on February 11, 1795, by Delawares. Beecroft, Benjamin, captured on April 1, 1793, at Morgan's Station, Ky. Beecroft, Rachael [sic], 14, captured on April 1, 1793, at Morgan's Station,

Ky.; surrendered on May 9, 1795, by Delawares.... Brown, John, captured in 1791 on Ohio side of river near Falls of Ohio.... Camp, John, captured in 1778 in Kentucky. Corder, Jenny, 28, captured on March 26, 1793, on the Wilderness Road in Kentucky; surrendered on July 10, 1795, by Wyandots.... Ford, Polly, 8, captured in 1786 on the Wilderness Road in Kentucky; surrendered in 1795 by Shawnees. Frazier, Daniel, 15, captured in April 1790 in Powell's Valley, Ky.; surrendered on June 20, 1795, by British trader Ian McDougall.... Gibson, David, 23, captured on December 5, 1790, at Dunlap's Station, Ky.; surrendered on August 7, 1795, by Wyandots. Glass, Robert, captured in 1779 in Kentucky; surrendered in 1795 by Shawnees.... Green, Betsy, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Green, Polly, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees.... Hart, Elizabeth, 29, captured on May 11, 1790, in Madison Co., Ky.; surrendered on September 14, 1795, by St. Joseph Potawatomies. Hart, Elizabeth and child, captured in 1789 on Salt River in Kentucky; surrendered in 1791 by Shawnees. Hart, Israel, captured in 1790 at Crab Orchard, Ky.; surrendered in 1795 by Shawnees. Hogling, Moses, captured in 1778 while fishing in Floyd's Fork, Ky.; surrendered in 1795 by Shawnees. Holbrook, Jenny, 14, captured in May 1789 in Madison Co., Ky.; surrendered on September 14, 1795, by St. Joseph Potawatomies.... Horn, Peggy, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Horn, Polly, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Johnson, James, captured on July 3, 1794, in Kentucky; surrendered on May 9, 1795, by Delawares. Johnson, John, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Johnson, Joseph, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Johnson, Patty, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Johnson, Peggy, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. Keer, John, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees.... Love, Timothy, captured in May 1792, at head of Big Benson Creek in Kentucky; surrendered in 1795 by Shawnees. Lusk, Samuel, 18, captured in 1793 at head of Big Sandy; surrendered in 1795 by Shawnees. Martin, Thomas, captured in 1790 in Kentucky; surrendered in 1795 by Shawnees. McCarty, James, captured in 1790 on Ohio River above mouth of Green River; surrendered in 1795 by Shaw-

nees. McKeever, Betsey [sic], captured in 1783 in Kentucky; surrendered in 1795 by Detroit River Wyandots. McKensie, Betsy, captured in 1792 in Kentucky; surrendered in 1795 by Shawnees. McKensie, Nancy, captured in 1792 in Kentucky; surrendered in 1795 by Shawnees. Mitchell, Mary, captured in 1774 on the Wilderness Road in Kentucky; surrendered in 1795 by Ottawas. Mitchell, James Hughes, captured in 1787 on Ohio River near mouth of Great Miami River; surrendered in 1791 by Shawnees. Mitchell, Sally, 17, captured in October 1790 in Kentucky wilderness; surrendered on July 30, 1795, by Mingoes. Parsain, Sarah, 14, captured on August 9, 1790, in Madison Co., Ky.; surrendered on September 14, 1795, by St. Joseph Potawatomies.... Raughley, Victor captured on April 1, 1793, at Morgan's Station Ky.; surrendered in 1795 by Shawnees.... Rigil, Kissey, captured in 1792 in Kentucky; surrendered in 1795 by Shawnees ... Ronune, Isaac, captured in 1786, near Lee's Town, Ky.; surrendered in 1795 by Shawnees. Ruddell, Abram, captured on June 22, 1780, at Ruddell's Station, Ky.; surrendered in 1795 by Shawnees. Ruddell, Stephen, 10, captured on June 22, 1780, at Ruddell's Station, Ky.; surrendered in 1795 by Shawnees. Samuel, Robert, captured in April 1794 on Ohio River just below mouth of Salt River in Kentucky; surrendered in 1795 by Potawatomies.... Sharp, Mary, captured in 1786 near McAfee's Station in Kentucky; surrendered in 1795 by Shawnees. Shaw, John, captured in April 1792 near head of Beargrass Creek in Kentucky; surrendered in 1795 by Shawnees. Shaw, William, captured in April 1792 near head of Beargrass Creek in Kentucky; surrendered in 1795 by Shawnees.... Smith, Peter, captured in 1793 near Falls of Ohio; surrendered in 1795 by Potawatomies. Smock, John, captured in March 1794 on Brashear's Creek, Ky.; surrendered June 10, 1795, by Potawatomies. Smock, Peter, Jr., 14, captured in March 1794 on Brashear's Creek, Ky.; surrendered June 10, 1795, by Potawatones. Spangler, David, 22, captured on December 9, 1774, at Falls of Ohio; surrendered on May 15, 1795, by Potawatomies. Stephenson, Jenny, 19, captured on August 11, 1792, in Madison Co., Ky.; surrendered on September 14, 1795, by Shawnees. Stephenson, Jane, captured in 1792 at Paint Lick, Ky.; surrendered in 1795 by Shawnees.... Thorn, Samuel, Jr., 20, captured in March 1790 at Falls of Ohio;

"It was this return of prisoners, as much as anything that finally convinced the Kentucky settlers that peace had truly come at last and that now a man could chop his wood or pasture his cattle and horses without fear of being robbed or killed by Indians." Eckert, *supra*, at 619. Depredations however, did not end. "Around 1805, [near Crittenden, in Grant County, Kentucky] party of Indians burned the Bran home after scalping parents and children. All died except the mother, who crawled to the Kennedy house. She eventually recovered." *http://www.kentucky. gov/Kyhs/hmdb/marker search. aspx?mode= subject&subject=107,* marker # 936. It wasn't until the battle of Tippecanoe (and Tyler too!), on November 7, 1811, that the Shawnee and the other American Indian tribes of the region finally lost their grip on the Midwestern Ohio Valley lands they had roamed for thousands of years. *http://www.tcha. mus. in.us/ battlehistory.htm.* Still, it was several years later, before Kentucky acquired its eight western-most counties, as a result of their purchase from the Chickasaw Indians for $300,000.00 in 1818. This area of Kentucky is now referred to as the Jackson Purchase area.

These were the times, when Kentucky's first Constitutions (1792 and 1799)—standards for today—were written. Times when even a felon, after serving his, or her, time, would have been expected to have a right to defend himself, his farms and family. Yet, today's times are still dangerous. In the last ten (10) years, 2,145 Kentuckians have been murdered. *http://www.kentucky statepolice.org/pdf/ crimefacts2004.pdf.*

## SECTION ONE AND ITS CONTEXTUAL RELATIONSHIP IN THE KENTUCKY CONSTITUTION

We are assured by the logic of the majority opinion that the word "citizen" as used in the Kentucky Constitutions of 1792, 1799, and 1850, conceptually excluded "felons" as "citizens"—*even though the word used in Section 1 by the founders of our 1891 Constitution is "men."* We are cited to the case of *Amy v. Smith*, 1 Litt. 326, 11 Ky. 326 (Ky.1822) for the language:

Before we can determine whether she was a citizen, or not, of either of those states, it is necessary to ascertain what it is that constitutes a citizen. In England, birth in the country was alone sufficient to make any one a subject. Even a villain or a slave, born within the king's allegiance is, according to the principles of common law, a subject; but it can never be admitted that he is a citizen.

First, let me say, *Amy* dealt only with the question of whether a slave in 1822 could sue for her freedom, claiming the "privileges and immunities" of citizens under the Constitution of the United States. Let me also say, that since the comment regarding "villain" was made within the context of "a villain or a slave, *born within the king's allegiance,*" the proper spelling of the word "villain" was, "villein." "A villein was a person attached to a manor, who was substantially in the condition of a slave, who performed the base and servile work upon the manor for the lord and was, in most respects, a subject of property belonging to him." *Black's Law Dictio-*

surrendered on June 5, 1795, by Potawatomies. Thom, Samuel, Sr., captured in 1789 o@n Brashear's Creek, Ky.; surrendered in 1795 by Shawnees. Van Bibber, Joseph, captured in 1792 in Kentucky; surrendered in 1795 by Shawnees. Van Cleve, Samuel, cap-

tured in February 1794 on Brashear's Creek, Ky.; surrendered in 1795 by Potawatomies.... Young, Elizabeth, and one child, captured on April 1, 1793, at Morgan's Station, surrendered in 1795 by Shawnees." Eckert, *supra* at 746–50.

*nary,* Rev. 4th Ed. at 1741. "A freeman was an allodial proprietor; the opposite of a vassal or feudal tenant; a free tenant or freeholder as distinguished from a **villein.**" *Case of Fry,* 71 Pa. 302, 21 P.F. Smith 302, 306, 1872 WL 11181 (Pa.1872) (emphasis added).

Secondly, it is suggested that to be a "citizen" of the times, individuals were required to meet a slew of eligibility requirements, including that of being a property owner. Thus, the word "men," rather than "citizen," operated to relax some of these onerous requirements. In response to this, let me point out that Kentucky *never required the ownership of property as a basis for the right to vote.* Kentucky was a Jacksonian western frontier State at the time of its inception, and that attitude during the frontier times never changed.

In clarifying the use of the word "men" in Section 1 of the Constitution, as well as clarifying the intent of the framers of our Constitution in regards to the "right to bear arms," and in illuminating the different opinions between Kentucky in *Bliss* and Tennessee in *Amy,* one needs to look to the debates in the Constitutional Convention between Mr. J.L. Phelps, a delegate from Louisville, and Mr. Robert Rodes, the chairmen of the standing committee for the Constitutional Preamble and Bill of Rights, which committee formulated the language used:

The CLERK. The next amendment was offered by the same Delegate:

Amend section 1 by striking out from line 1 the word "men," and inserting in lieu thereof "persons."

Mr. PHELPS. I have offered that same amendment to section 4. *My reason for doing that is, that I believe the word "persons" is a better generic word than the word "men."* In the report of the Committee, sections 11, 12, 13, 17, 19 and 20, they say, "no person shall, for an indictable offense," "no person shall, for the same offense, be twice put in jeopardy," "all courts shall be open, and every person, for an injury done him," &c., "no person shall be attainted of treason," &c., "the estates of such persons as shall destroy their own lives," &c. All the way through they use the word "person," but in the first and fourth sections they use the words "men" and "man." *It may be at times that the word "man" is construed to include all persons; but where in the same article, in another section, you use the word "persons" it might be construed that there was some reason for using the word "man," and in an effort to give construction to the whole, the courts would be bound to hold that in that section it was intended to apply to men alone.* It cannot be that the Committee meant section 4 to apply only to the male sex. And I say, while the right of women may be safe at the polls in the hands of men, their rights of conscience, and as to religion, are better if intrusted to themselves. [Section 1(2) of the Kentucky Constitution] in order to secure uniformity throughout the report of the Committee, I ask that "persons" be inserted for "men" and "person" for "man" in the two sections referred to.

Mr. RODES. I think my friend has forgotten one distinction. *The word "persons" is applicable to corporations; the word "man" is generic.* Of course you could substitute the word "one" or "person." *But certainly we know what "men" means, and in this sense it means every thing.*

Mr. PHELPS. Why do you use the word "person" in all the other sections?

Mr. RODES. The word "person" refers to corporations sometimes. In some of these sections the word "per-

sons" will be defined to include corporations.

The question being taken on the adoption of the amendment of the Delegate from the First District of Louisville, it was declared to have been rejected.

*Debates Constitutional Convention*, 1890, Ky. Vol. I, 817–818 (emphasis added).

Their next discussion dealt with the breadth of the "right to bear arms."

The CHAIRMAN.   The Clerk will report the next amendment.

The CLERK.   The next amendment was that offered by the Delegate from Russell: Strike out subsection 7 of the section 1 and insert the following, viz: "The right to bear arms, subject to the power of the General Assembly to pass laws to prevent persons from carrying concealed arms."

Mr. J.L. PHELPS.   It seems to me that the object of this clause, as presented by the Committee, was to procure the right to all men to bear arms, and that the Legislature should have the right to forbid the carrying of concealed arms. If that is the idea, my amendment expresses it.   But the Committee have undertaken to say that they can bear arms for certain purposes in defense of themselves, their families and of the State, or in aid of the civil power when thereto legally summoned, subject to the power of the General Assembly to pass laws to prevent person from carrying concealed arms.

Don't that forbid a man from carrying arms when he goes hunting or deer-driving?   Don't it forbid the carrying of arms for any except the purposes named?   I want to say that a man should have the right in Kentucky to bear arms for any purpose he pleases, so that he does not bear them concealed.

Mr. RODES.   The gentleman does not make the proper distinction.   This is not a grant of power; it is a limitation of power.

Mr. J.L. PHELPS.   Is not there a grant of power in it?

Mr. RODES.   *No, sir; the right to bear arms is a universal right; and the Legislature is forbade to pass any law interfering with that right.*

Mr. J.L. PHELPS.   Does it not give the Legislature power to prevent the carrying of arms for any purpose except what are here enumerated?

Mr. RODES.   *It authorizes the Legislature to prohibit the carrying of concealed weapons; but that is all.*

The question being taken on the adoption of the amendment offered by the Delegate from Russell, it was declared to have been rejected.

*Debates Constitutional Convention*, 1890, Ky. Vol. I, 818–819.

Thus, all arguments to the contrary— our founders constructed the Bill of Rights using the word "men" in a generic sense, to mean, for want of a better word, humanity.   The reason it was used was to exclude corporations.

Moreover, the rights set out in Section 1 were defined as "inherent and inalienable" rights.   "Inherent" is an "authority possessed without it being derived from another."   *Black's Law Dictionary*, 921 (4th ed. 1968).   "Inalienable" means "not subject to alienation . . . e.g. liberty."   *Id.* at 903.

Not only did the Constitutions of Kentucky not limit the word "citizen" as suggested by those who would have it exclude "convicted felons"—of the twenty-five rights granted under the Bill of Rights, *eleven (Section 7, 9, 10, 11, 12, 13, 16, 17, 18, 20, 25) deal specifically with crime and criminals.*   Given this context, it is simply unacceptable to assert that the founders of

our Constitution—people who chose words with a precision unknown today—ever intended for the "right to bear arms," or the "right of self-defense," to be limited only to those who had never committed a crime, without saying it!

Looking further at the contextual placement, Section 1 of Article III of the 1792 Kentucky Constitution provided, "in elections by the citizens, all free male citizens of the age twenty-one years ... shall enjoy the rights of an elector; but no person shall be entitled to vote except in the county in which he shall actually reside at the time of the election." Section 3 of Article III, of the same Constitution provided, "Electors shall, in all cases, except treason, felony, and breach of surety of the peace, be privileged from arrest during their attendance at elections, and in going to and returning from them." Article VIII, Section 2, provided, "[l]aws shall be made to exclude from office and suffrage, those who shall thereafter be convicted of bribery, perjury, forgery, or other high crimes or misdemeanors."

In this same light, Section 145 of our current Constitution, titled "Persons Entitled to Vote," states:

Every *citizen* of the United States of the age of eighteen years who has resided in the state one year, and in the county six months, and the precinct in which he offers to vote sixty days next preceding the election, shall be a voter in said precinct and not elsewhere but the following persons are excepted and shall not have the right to vote.

(1) *Persons convicted in any court of competent jurisdiction of treason, or felony, or bribery in an election,* or of such high misdemeanor as the General Assembly may declare shall operate as an exclusion from the right of suffrage, but persons hereby excluded may be restored to their civil rights by executive pardon.

(2) Persons who, at the time of the election, are in confinement under the judgment of a court for some penal offense.

(3) Idiots and insane persons.

(Emphasis added).

What then, was the purpose of adding subsequent Sections 1 and 2 to Section 145, if the word "citizen" already excluded "convicted felons?"

Moreover, prior to the 1890 Constitutional Convention, even our predecessor court acknowledged in *Anderson v. Winfree,* 9 Ky.L.Rptr. 181, 85 Ky. 597, 4 S.W. 351, 353 (Ky.1887), that only citizens convicted of "infamous crimes" (not all felonies) were denied the right of suffrage under the statutes of the time. Again a privilege—not an inherent and inalienable right:

The Legislature having this constitutional provision as a guide, and knowing what crimes are denounced by the common law as infamous, and that the perpetrators are, among other things, excluded from the right of suffrage upon conviction, doubtless enacted the law that "any person convicted of robbery, forgery, counterfeiting, or perjury, or other like crime, shall forfeit his right of suffrage and right to hold office," with a view to crimes declared infamous by the common law, and meant by the words "or other like crimes" to include all crimes, not previously specified, which are inconsistent with common principles of honesty and humanity, and convict the perpetrator of degradation, depravity and moral turpitude. The several crimes enumerated in the statute are of this class, known as infamous crimes; and it is to be presumed that the expression "or other like crimes" was intended to apply to and embrace such other crimes as are likewise inconsistent with

common principles of honesty and humanity, and convict the perpetrator of depravity and moral turpitude.

*Id.* at 353.

Obviously then, under our previous Constitutions, citizens who were convicted of crimes, other than those treated as "infamous," were still allowed to vote. Thus, at the Constitutional Convention of 1890, Delegate George Washington, of Campbell County, explained the change proposed in our present Constitution:

Here we have the qualifications of a voter defined, in what may be termed a general rule.... By the first of these, all are disqualified who maybe convicted, in any Court ..., of treason or felony; .... This, we respectfully submit, is an improvement upon ... the corresponding section [Article VIII, Section 4 of 1850 Kentucky Constitution] in the present Constitution.

*Debates Constitutional Convention,* 1890, Ky. Vol. II 1807.

....

In other words, the section as framed by the Committee, is what is termed "self-executing." It requires no aid from legislation.... For it is a matter which concerns the purity and dignity of the elective franchise; a right which all good citizens will admit should be exalted in the public esteem. It should require no argument to persuade us that convicted felons should not be permitted to enjoy that inestimable privilege, upon the preservation of which, in a state of purity, representative Government itself depends.

*Debates Constitutional Convention,* 1890, Ky. Vol. II, 1808.

And one cannot ignore the plain language of delegate, Sam'l J. Pugh, of Lewis County, when arguing against outlawing duels, he pointed out to the 1849 Convention:

That brings to you to the point I wanted to get you. Does not Kentucky to-day offer an asylum to every murderous villain, who comes here from a foreign country with his hands still crimson in the blood of his fellow-man, that he may have assassinated in cold blood? Are not all the possibilities and privileges of citizenship open to such a criminal, does not the law, as you would have it, discriminate in favor of such an assassin, as against the man who engages in open combat [referring to duels]?

*Debates Constitutional Convention,* 1890, Ky. Vol. IV, 4712. (Discussing the banning of dueling).

If as argued by some of the commentators of the twentieth century and the majority of this court, the framers of the constitution of Kentucky in the late eighteenth century, meant the term "citizen" to exclude those convicted of felonies (*i.e.,* that they were excluded from such rights by use of the word "citizen") then the constitutional provisions I've just cited above and that our founders *put in* the Constitution, were only surplusage, or a waste of words. With the precision of language they employed, and implored others to use, I cannot accept the assertion that the language used—was used so imprecisely. Clearly the comments of delegate Sam'l J. Pugh show otherwise. The argument that one could be excluded from an "inalienable and inherent" right without express exclusion, yet express exclusion was required to deprive one of a "privilege" (e.g., voting), is simply untenable in the science and use of language.

Especially, when a careful perusal of the official report of the proceedings and debates in the convention held in Frankfort in September of 1890 discloses the distrust many of the delegates had for the "High

Courts" and how they had construed (or misconstrued) language in previous Constitutions. The debates report that the delegate from Pendleton County, Mr. Leslie T. Applegate, argued to those assembled:

> Yet some of these principles are vital to the issues of the day. We have labored somewhat upon them and have altered them some. Why? Because the experience of time has shown that along in 1849 or in 1850, and even going back to 1792, they didn't mean what the men who used them thought they meant; and while I have the profoundest respect for our courts, yet they have turned their forces upon it, and they have turned the light of reason upon it, and we have found that these expressions are deficient to protect men and their private rights, and for that reason we have enlarged upon the expressions here. . . .
>
> . . . .
>
> If you can ever use language so plain and specific that the Courts will not some time or another make a change in it, then I would like you to employ it, because this morning I sat down in the Library and took down Barbour's Digest and found that that Court has overruled itself more than one hundred times in its history; then if they themselves cannot say what they mean and stick to it, how in the name of Heaven can we use any language that will be always construed as we wish it, and which they will stick to.

*Debates Constitutional Convention,* 1890, Ky. Vol. I, 590–591.

The Honorable delegate from Todd County, Mr. H.G. Petrie, also pointed out to those assembled:

> [I]n thinking about it, it occurred to me that these judges who are giving this satisfactory interpretation of that clause of the Constitution will in a few years pass away from the honored *seats* they now occupy, and those *seats* will be filled by other judges. It will be, as it was said by the Delegate from Pendleton, the same court but different judges. Who knows how they may view that section? They may conclude that the interpretation of the present Judges is wrong. They may be unable to concur. They may say that the construction given that clause by some of the other Judges away back yonder was the correct one; and then we would have the trouble over again; *so that it seems to me if human language can be so arranged as to express really the thought intended to be conveyed by that . . . section, that it ought to be done.*

*Id.* at 625. (Emphasis added).

The presumption exists that in framing the Constitution great care was exercised in the language used to convey its meaning and as little as possible left to implication. *City of Louisville v. German,* 150 S.W.2d 931, 935, 286 Ky. 477 (Ky.1940).

I hope, by now, one understands that in Kentucky's earlier Constitutions the term "citizen" did not exclude "convicted felons" *by any implicit definition adopted from a country from which we seceded in war.* Nor did the word "men," in the first section of the Bill of Rights, limit the enjoyment of those Rights to males, as some might suggest.[13]

## PRECEDENTS

Looking to prior decisions of our predecessor court to shed light on the subject, the first case I found on the "right to bear arms" is the decision of *Bliss v. Common-*

---

13. The "privileges and immunities" and "equal protection" clause were applicable to the States through the adoption of the 14th Amendment to the United States Constitution in 1868—twenty-three years before the adoption of our 1891 Constitution.

*wealth,* 2 Litt. 90, 12 Ky. 90, 1822 WL 1085 (Ky.1822). *One would assume that the issue presented was new to the Commonwealth* from the fact that this lengthy decision *contains no citations to any previous authority. Bliss* dealt with the constitutionality of the *then new* Kentucky statute that provided "that any person ... who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, ... shall be fined in any sum not less than one hundred dollars." *Id.* In the words of the indictment presented, Bliss was charged with having carried a sword in a cane, concealed as a weapon. He was found guilty of the charge and fined one hundred dollars.

Our predecessor, the then Court of Appeals, reversed the conviction on grounds that the statute was unconstitutional as an infringement of Bliss's "right to bear arms" under the then twenty-third section of the tenth article of the 1799 Kentucky Constitution, which again, provided "the rights of the citizens to bear arms in defense of themselves and the state, shall not be questioned." In rendering the decision, the court noted:

> [I]t is the right to bear arms in defense of the citizens ... that is secured by the Constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the Constitution. Not merely all legislative acts, which purport to take it away; but all which diminish or impair it as it existed when the Constitution was formed, are void.

*Id.* at 91.

The next case I found was *Ogles v. Commonwealth,* 11 Ky.L.Rptr. 289, 11 S.W. 816 (Ky.1889), decided the year before the 1890 Constitutional Convention. In December, 1887, the sheriff of Hickman County was shot and killed while attempting to arrest Sam Price, a friend of the appellant, Ogles, at Ogles's house, where they both resided. It was night, and Ogles and Price were sleeping in the same room. Price came out of the house first, refusing to be arrested. Immediately behind him came Ogles, gun in hand. The sheriff then directed one of his posse to arrest Ogles and take his gun from him. When attempted, Ogles resisted, a struggle took place—the sheriff was shot.

The evidence tended to show that Price did it. Ogles, however, was tried as an aider and abettor of the crime and convicted and sentenced to life. At trial, Ogles claimed that when the killing took place he did not know that the purpose of the posse was to arrest Price. He thought that some private persons were about to injure or kill him. He said he did not recognize the sheriff until after the shooting.

On appeal, he complained that the Instructions violated his Constitutional "right to bear arms." Instruction number 5, after having set out the parameters of the crime, stated:

> [I]n that the defendant Elam Ogles was then staying at said residence, and did not have either notice or knowledge of who the sheriff and his *posse* were, and did not have notice or knowledge of the purpose of the sheriff and his *posse* in being at said residence, but in good faith believed the sheriff and his *posse* were persons then and there for the purpose of committing violence to someone then staying at said residence, then he had the right to take, keep, and carry his gun in and about said residence for investigation, and for the purpose of the defense or protection of any person there staying from violence and bodily harm, and had the right to struggle against his gun being taken away from him, and, if he had it, under these circumstances, and for said purpose, and if

the jury believe from the evidence that he did not knowingly and intentionally either aid, abet, incite, encourage, counsel or advise Sam Price to resist said arrest or attempted arrest, they will acquit him.

Upholding the conviction, the court stated:

It is claimed that even if he knew Winters was the sheriff, and that he and his *posse* were lawfully there to make an arrest, yet he had the right, under the existing circumstances, and when his brother-in-law was resisting arrest, to seize his gun and investigate the matter. *To this we cannot assent. It is equivalent to saying that a man may so exercise his Constitutional rights as to violate the law....*

This Instruction protected the Appellant, if he was acting in good faith: *and, if he was not, then his constitutional right to carry arms cannot excuse him.* He cannot so exercise it as to intimidate officers in the discharge of their duty and thus give aide and encouragement to those resisting lawful arrest.

*Id.* at 818 (emphasis added).

*Ogles* recognized that a constitutional right may not be exercised to threaten, impede, or injure others in an unlawful manner; when it interferes with the lawful rights of others, it has no constitutional protection.

The next case I found is *Holland v. Commonwealth*, 294 S.W.2d 83, 85 (Ky. 1956). In *Holland,* the court stated:

The foregoing [Section 1(7) of the Kentucky Constitution] is an exemplification of the broadest expression of the right to bear arms. Some states give the legislature the right to regulate the carrying of firearms; at least one state prohibits even the possession of firearms.

In our state the legislature is empowered only to deny to citizens the right to carry concealed weapons. *The constitutional provision is an affirmation of the faith that all men have the inherent right to arm themselves for the defense of themselves and of the state. The only limitation concerns the mode of carrying such instruments.*

*Id.* at 85 (emphasis added).

Again, in 1971, the Criminal Law Revision Advisory Committee acknowledged the *Holland* opinion as binding authority. This committee *drafted* the law forbidding concealed weapons in the chapter of the penal code dealing with "firearms offenses." The commentary they wrote then reflected the belief of the time.

Section 1(7) of the Kentucky Constitution gives all persons "[t]he right to bear arms in defense of themselves and the state, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons." *No other legislative limitation to the Constitutional right to carry weapons is valid.*

*Kentucky Penal Code, Final Draft, § 2805, Commentary,* 284 (1971) (citing *Holland v. Commonwealth,* 294 S.W.2d 83 (Ky.1956) (emphasis added)).

However, in 1983, this court (in a new age) considered the "right to bear arms" under Section 1(7) of the Kentucky Constitution and, *as prophesized by the delegates at the 1890 Constitutional Convention,* reversed its position as previously set out in *Holland* and *Bliss* on the breadth of the "right to bear arms," stating,

"[i]t is our opinion that a statute limiting the possession of firearms by persons *who, by their past commission of serious felonies,* have demonstrated a dangerous disregard for the law and thereby present a threat of further criminal activity is reasonable legislation in

the interest of public welfare and safety and that such regulation is constitutionally permissible as a reasonable and legitimate exercise of the police power."

*Eary v. Commonwealth,* 659 S.W.2d 198, 200 (Ky.1983).

*Eary,* upon which the majority now relies, does not, however, support their own position. A Class D felony based only on possession of marijuana is not normally regarded as a *"serious felony."* "Eary had been previously convicted of four felonies, viz, first-degree burglary ... storehouse breaking and possession of burglary tools." *Id.* at 199. *See also, Boulder v. Commonwealth,* 610 S.W.2d 615, 617 (Ky.1980) (overruled on other grounds) (preceding conviction was First–Degree Assault).

Until the *Eary* opinion in 1983, *no one had ever suggested* that the "right to bear arms" under the Kentucky Constitution could be subjected to the "general" police power. Indeed, *being a general power, rather than a specific power,* such interference, as was approved in *Eary,* is in direct violation of Section 26 of the Kentucky Constitution: "We Declare that everything in this Bill of Rights *is excepted out of the general powers of government,* and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution shall be void." (Emphasis added).

Constitutional conflicts between the Bill of Rights and specific powers are not reconciled by Section 26, but conflicts between the Bill of Rights and general powers are—with the Bill of Rights being held inviolate in such instances.[14] A general power may not intrude within any protected sphere of the Bill of Rights—"We Declare that every thing in this Bill of Rights is excepted out of the *general powers* of government ..." Ky. Const. § 26.

But as was shown by the excellent briefs in this case, the *Eary* court was not advised of the wealth of authority concerning the "right to bear arms," which has now been presented to us. But regardless of the reason for the decision in *Eary,* it completely misstates the Constitutional Law in Kentucky, as does the majority opinion in this case, which upholds *Eary.*

Stare decisis is ordinarily a wise rule of action. But it is not a universal, inexorable command. "The principle of 'stare decisis' does not require us to adhere blindly to previous decisions when we determine those decisions were in error." *Thomas v. Commonwealth,* 931 S.W.2d 446, 447 (Ky. 1996), overruled on other grounds by *Morgan v. Commonwealth,* — S.W.3d —, 2006 WL 140564 (Ky.2006).

The language of Section 26 of the current Constitution has been a part of every Kentucky Constitution. Its meaning is evident from the plain language used. If a statute violates the Constitution, it is void and this was so held in *Stidger v. Rogers,* 1801 WL 541, 2 Ky. 52 (Ky.App.1801). Section 26, is in effect, a declaration that the government of Kentucky has constitutional limits that cannot be transcended. This was emphasized in *Grauman v. Jefferson County Fiscal Court,* 273 Ky. 674, 117 S.W.2d 918 (1938).

[u]nlike those governments possessing no written constitution, the power of the legislative departments of our national and state governments is not omnipotent. The nature and form of our government imposes limits upon it. The constitution itself is in every real sense the supreme law, the makers thereof being the people themselves in whom, under our political system, sovereignty primarily resides. Though the legislature of a state may exercise all govern-

**14.** This specific point, however, has not been argued in this case.

mental power not denied it and may enact any law not expressly forbidden by the state or the federal constitution, where such authority has been withheld the people have declared that any act transcending that restriction or opposing that supreme law shall be void.

*Id.* at 919–920.

Conventional wisdom supports the idea of a police power that gives the legislature authority to enact all laws necessary for the good of society. If put to a plebiscite, through a constitutional amendment, doubtless some version supporting a statute similar to KRS 527.040 would be adopted by a majority. *I suggest, however, that there would be much more discussion about whether such a statute should apply to all "convicted felons," or just to those who have committed serious crimes that ordinarily portend a future pattern of violence involving weapons as was noted in Eary.* ("It is our opinion that the state limiting the possession of firearms by a person who, by their past commission of serious felonies.") *Eary* 659 S.W.2d at 200.

Nobody wants this type of stereotypical convicted felon to have access to firearms, and his prior illegal use of such firearms would support such an objective, even under a "strict scrutiny" review.[15] *Ogles* would support such a view. "To this we cannot assent. It is equivalent to saying that a man may so exercise his Constitutional rights as to violate the law...." *Ogles,* 11 S.W. at 818.

Thus the Amendment embraces two concepts,—freedom to [own] and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The free-

dom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.

*Lawson v. Commonwealth,* 291 Ky. 437, 164 S.W.2d 972, 973 (1942).

However, we are not at this time construing a statute which is so limited. The state before us deprives all "convicted felons" in Kentucky of the right to bear arms, including people like Peggy Ligon.

The police power theory, relied on in *Eary* (unleashed now from its limitations to "serious" felonies), undermines constitutional precepts. If the court agrees that the police power allows regulation of possession, despite the plain language of our Kentucky Constitution, then no right is safe. In fact, when inquired of during oral arguments in this case, the Commonwealth asserted that, if the legislature so desired, it could use its "general police power" to limit possession of weapons only to those over the age of 25 years. *Power once acquired, knows no boundaries, except those stringently maintained by others.* This is our job, but we remain silent.

### *"STANDARD OF SCRUTINY"*

The majority also asserts that a "rational basis analysis" is sufficient support for the denial of the Constitutional rights noted herein. Yet, this is not a "burden" case—this is a "deprivation" case. A court cannot deprive a person of a "core value" constitutional right with a "rational basis" test. *Republican Party of Minnesota v. White,* 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

---

15. My experience tells me however, that this type of criminal would still have and use weapons. Again, the only way I believe you can truly protect society from such a criminal is to incarcerate him for a lengthy term when he uses a weapon unlawfully.

"Whenever it is determined that legislation significantly interferes with the exercise of a fundamental right, a court must review the legislation with *strict judicial scrutiny,* under which the state must demonstrate that the statute serves a compelling state interest, and that the state's objectives could not be achieved by any less restrictive measures." 16A Am. Jur.2d, *Constitutional Law,* § 387, at 346–47. (Emphasis added). Thus, KRS 527.040, by including persons who pose no threat to the general welfare, could not pass a "strict scrutiny" test were it even applicable. KRS 527.040, however, doesn't just interfere or burden the right—it destroys it. Thus, under our Kentucky Constitution—no test can save it.

The Bill of Rights was designed to protect the individual against the majority. That is plain. Under the police power theory, allowed by the majority, the Bill of Rights is little more than a statement of aspirations, to be limited, or cast aside, whenever it suits the purpose of the then majority. That is plain now. But to protect the rights of all, this court must protect the rights of Ricky Posey and Peggy Ligon. The simple rule of constitutional law is that if we don't protect their rights—we cannot protect our own.

I am sad that we have failed. But let me close with some "words of conscience" from some wise people.

"The judiciary is the political ark of the poor man, to which he must flee in times of trouble; the shield by which he is to resist attempts of power to deprive him of his rights." *Report of the Debates,* 1849 at 149–150. "Great God, the eloquence in those words! 'Crown jewels,' ... 'gathered from the caskets of liberty, where all found a home and resting-place.'" *Debates,* 1890 at 500.

The language of our forefathers therein, being plain, understandable and forthright, Section 1(1, 7) and Section 26 say what they mean and mean what they say. Therefore, I must dissent from a majority opinion, which says otherwise.